1  Stan M. Barankiewicz II, Esq. (State Bar No. 204513)
   Christopher M. Wolcott, Esq. (State Bar No. 274884)
2  **ORBACH HUFF & HENDERSON LLP**
   1901 Avenue of the Stars, Suite 575
3  Los Angeles, California 90067-6007
   Telephone   (310) 788-9200
4  Facsimile:   (310) 788-9210
   sbarankiewicz@ohhlegal.com
5  cwolcott@ohhlegal.com

6  Attorneys for Plaintiff/Petitioner
   ZAMPERINI AIRFIELD PRESERVATION SOCIETY

7

8

9            **UNITED STATES DISTRICT COURT**

10           **CENTRAL DISTRICT OF CALIFORNIA**

11

12  ZAMPERINI AIRFIELD                  CASE NO.: 2:24-cv-04538-CBM-JPR
    PRESERVATION SOCIETY, a
13  California unincorporated association,  **PLAINTIFF/PETITIONER'S**
                                        **OPENING BRIEF IN SUPPORT OF**
14            Plaintiff/Petitioner,     **WRIT OF MANDATE**

15  v.                                  Date:    July 22, 2025
                                        Time:    10:00 a.m.
16  CITY OF TORRANCE, a California       Place:   Department 8D
    municipal corporation and ROES 1     Judge:   Hon. Consuelo B. Marshall
17  through 100,

18            Defendants/Respondents.    Petition Filed:    April 22, 2024

19

20

21

22

23

24

25

26

27

28

ORBACH HUFF & HENDERSON LLP

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES ..........................................................................4

I.      INTRODUCTION ..............................................................................8

II.     STATEMENT OF FACTS.................................................................10

        A.      Torrance Municipal Airport ...................................................10

        B.      ZAPS and Its Members ..........................................................11

        C.      The City's Multi-Front Attack on Flying Aircraft................11

        D.      The FAA's Admonitions Against the City for its Prior Flight Restrictions.........................................................................14

        E.      The Touch & Go Ordinance....................................................14

III.    PROCEDURAL HISTORY ...............................................................15

IV.     OTHER CHALLENGES TO THE CITY'S ACTIONS ....................16

V.      JURISDICTION AND VENUE ........................................................16

VI.     STANDARD OF REVIEW................................................................18

VII.    LEGAL ARGUMENT .......................................................................19

        A.      The Federal Government's "Exclusive Sovereignty" Over the County's Airspace Categorically Prevents the City from Enforcing the Touch & Go Ordinance .......................................20

                1.      The Federal Government Maintains Its Sovereignty Over Flight Maneuvers that are Impermissibly Banned and Restricted By the Touch & Go Ordinance................................22

        B.      The Touch & Go Ordinance Regulates Overflight that Follows FAA Flight Patterns .................................................................23

        C.      The Touch & Go Ordinance Is Preempted by Federal Law ..............26

                1.      The Touch & Go Ordinance is Preempted Because Congress Has Regulated the Fields of Air Safety and Flight Operations...................................................................27

                2.      The Touch & Go Ordinance Is Also Preempted Because It Conflicts with ANCA .................................................31

                        a.      *The City Failed to Comply with the ANCA* ...................33

                        b.      *Labeling the Flight Restriction as a "Safety-Based Restriction" Does Not Prevent Preemption* ...................35

        D.      Local Noise Restrictions that Limit Aircraft Operations Are Consistently Held to Be Preempted by Courts .................................35

        E.      The Proprietor Rights Exception Is Insufficiently Broad to Validate the Touch & Go Ordinance.................................................37

        F.      The Savings Clause Is Not Applicable Because it Only Preserves Remedies .................................................................39

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

G.    The City Adopted the Touch & Go Ordinance for the Improper
Purpose of Limiting Aircraft Overflight ....................................40

H.    The City Violated an Express Covenant of the Federal
Government's Deed for the Airport .......................................41

I.    The Touch & Go Ordinance Is Invalid, So this Court Should Issue
a Writ of Mandate or Equivalent Declaratory and Injunctive Relief..41

VIII.   CONCLUSION ...................................................................41

CERTIFICATE OF SERVICE ............................................................43

CERTIFICATE OF COMPLIANCE........................................................44

ORBACH HUFF & HENDERSON LLP

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

# TABLE OF AUTHORITIES

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008)......................17

*Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788 (5th Cir. 2000) ...........................38

*Arapahoe County Pub. Airport Auth. v. FAA,* 242 F.3d 1213 (10th Cir. 2001).....29, 37

*Arizona v. United States*, 567 U.S. 387 (2012)..........................................................27, 29

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ................................19

*Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920 (9th Cir. 2003)..................................19

*Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127 (9th Cir. 2021) .........................................28

*Blue Sky Entertainment, Inc. v. Town of Gardiner*, 711 F.Supp 678 (N.D.N.Y. 1989) ................................................................................................................................36

*Cal. Hotel & Motel Assn. v. Indus. Welfare Com.*, 25 Cal.3d 200 (1979) ..................18

*Calderon v. Ashmus*, 523 U.S. 740 (1998) ...................................................................19

*City & Cnty. of San Francisco v. F.A.A.*, 942 F.2d 1391 (9th Cir. 1991) ...................37

*City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973).......27, 29, 36, 37

*City of Santa Monica v. FAA,* 631 F .3d 550 (D.C. Cir. 2011) ...................................37

*Command Helicopter, Inc. v. City of Chicago*, 691 F.Supp 1148, (N.D.Ill. 1988)......36

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)....................................31

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ......................27

*Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160 (E.D. Cal. 2013)..........................................................................................................................17

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016) ................................................................................................................17, 19

*Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995 (9th Cir. 2013) ....................27, 31, 39

*Graber v. City of Upland*, 99 Cal.App.4th 424 (Ct. App. 2002)..................................40

*Gustafson v City of Lake Angelus*, 856 F.Supp. 320 (E.D.Mich. 1983)......................36

*Hillman v. Maretta*, 569 U.S. 483 (2013).............................................................31, 35

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ...............26

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ...................................................................31

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

*Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400 (7th Cir. 1974) ...................................21

*Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625 (2012)...........................................26

*Manufactured Home Communities, Inc. v. City of San Jose*, 420 F.3d 1022  (9th Cir.2005) ..............................................................................................................17

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ...............................................................26

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) .........................................19

*Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007) .............................27, 28

*Montana v. U.S.*, 450 U.S. 544(1981) ..........................................................................22

*Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016)....27, 28, 39

*Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81 (2d Cir. 1998) ...37, 38

*Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292 (1944) .................................8, 23

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190 (1983) ..................................................................................31

*Price v. Charter Tp. of Fenton*, 909 F.Supp 498 (E.D. Mich. 1995) .........................36

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ...............................................27

*Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100 (9th Cir. 1981).38, 39

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ......................................................16

*Stahm v. Klein*, 179 Cal.App.2d 512 (Ct. App. 1960).................................................40

*Township of Readington v. Solberg Aviation Co.*, 409 N.J. Super. 282 (App. Div. 2009)...........................................................................................................................40

*Trujillo v. City of Los Angeles*, 276 Cal.App.2d 333 (Ct. App. 1969) ........................40

*Tulare Loc. Health Care Dist. v. California Dep't of Health Care Servs.*, 328 F. Supp. 3d 988 (N.D. Cal. 2018)...........................................................................................17

*U.S. v. Wheeler*, 435 U.S. 313 (1978)...........................................................................23

*United States v. Causby*, 328 U.S. 256 (1946) .............................................................20

*United States v. City of Blue Ash*, 487 F.Supp. 135 (S.D.Ohio 1978) ........................36

*United States v. Helsley*, 615 F.2d 784 (9th Cir. 1979).................................................21

*Williams v. Eggleston*, 170 U.S. 304 (1898) ...............................................................23

*Yes in My Back Yard v. City of Culver City*, 96 Cal.App.5th 1103 (2023) .................17

5

ORBACH HUFF & HENDERSON LLP

**Statutes**

5 U.S.C. § 706 .................................................................................................18

5 U.S.C. § 706(b) ............................................................................................18

28 U.S.C. § 1331 .............................................................................................16

28 U.S.C. § 1367 .............................................................................................16

28 U.S.C. § 1651(a) .........................................................................................18

28 U.S.C. § 2201(a) .........................................................................................19

28 U.S.C. § 2202 .............................................................................................19

44 Stat. 568 .....................................................................................................20

49 U.S.C. § 171 *et seq.* ..................................................................................20

49 U.S.C. § 401 *et seq.* ..................................................................................21

49 U.S.C. § 1346 .............................................................................................21

49 U.S.C. § 40101(d)(4) ..................................................................................28

49 U.S.C. § 40102(a)(30) ................................................................................22

49 U.S.C. § 40102(a)(32) ................................................................................22

49 U.S.C. § 40103(a) .......................................................................................20

49 U.S.C. § 40103(b)(2) ...........................................................................21, 28

49 U.S.C. § 40103(e) .......................................................................................38

49 U.S.C. § 40120 ...........................................................................................39

49 U.S.C. § 47521 *et seq* ................................................................................9

49 U.S.C. § 47521(3) .......................................................................................32

49 U.S.C. § 47521(4) .......................................................................................32

49 U.S.C. § 47524 ...........................................................................................32

49 U.S.C. § 47524(b) .................................................................................32, 34

49 U.S.C. § 47524(c) .......................................................................................34

49 U.S.C. § 47524(c)(1) ..................................................................................32

49 U.S.C. § 47524(c)(2) ..................................................................................33

52 Stat. 973 .....................................................................................................20

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

Air Commerce Act of 1926 ........................................................................20

Civil Aeronautics Act of 1938 ..................................................................20

**Other Authorities**

Aeronautical Information Manual 4-3, Airport Operations ........................24

Aeronautical Information Manual 4-3-1, General.....................................24

Aeronautical Information Manual 4-3-2.b.................................................24

Aeronautical Information Manual 4-3-3, Traffic Patterns.........................24

Aeronautical Information Manual 4-3-23.................................14, 25, 29

Aeronautical Information Manual FIG 4-3-1 ............................................24

*American Jurisprudence*, Volume 11 .......................................................40

Pattern Complaints and Overflight Complaints, Section VII.C.1. ............33

**Regulations**

14 C.F.R. § 36.1(e) ....................................................................................11

14 C.F.R. § 36.1(f) .....................................................................................11

14 C.F.R. § 36.1(g) ....................................................................................11

14 C.F.R. § 36.1(h) ....................................................................................11

14 C.F.R. § 91.119 .....................................................................................22

14 C.F.R. § 161.205 ...................................................................................32

14 C.F.R. § 161.303 ...................................................................................33

14 C.F.R. § 161.305 ...................................................................................32

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2.......................................................................20, 26

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

Plaintiff and Petitioner Zamperini Airfield Preservation Society ("ZAPS") hereby submits its Opening Brief in Support of Motion for Writ of Mandate ("Motion") against Defendant and Respondent City of Torrance ("City").

## I.    **INTRODUCTION**

> "Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands."

*Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944). Yet, the City is getting in the way of that federal permission by adopting a scheme of ordinances aimed at regulating the number of aircraft flying over Torrance neighborhoods. One of these illicit ordinances is Ordinance No. 3930, "Touch (and Stop) and Go, Full Stop-Taxi Back and Low Approaches" ("Touch & Go Ordinance") which prohibits four specific flight training operations at the Torrance Municipal Airport ("Airport"). These prohibitions are precisely designed to, impermissibly, reduce air traffic over Torrance neighborhoods, not to limit noise emanating from the Airport. As stated by the City's Council Member Mattucci: "[U]ltimately, we want to reduce the number of flights, one way or another…." AR02545.

When these training operations were allowed, aircraft would remain in the overhead flight pattern, which, ZAPS for current purposes does not dispute, increases the amount of aircraft overflight of those neighborhoods beneath the pattern. But a pattern is a Federal Aviation Administration ("FAA") designated flight path around airports to facilitate the safe arrival, departure, and training operations. The City does not, and did not, define or control the North and South Patterns at the Airport—the FAA did. Instead of seeking resolution of neighborhood complaints about overflight with the FAA, the City has engaged in vigilantism by adopting the Touch & Go Ordinance to reduce the overflight air traffic without the FAA's permission. In other words, the City has swatted down air traffic over Torrance neighborhoods with the stroke of a pen. The City claims that it is simply regulating noise at the Airport under its proprietor rights in

ORBACH HUFF & HENDERSON LLP

owning the Airport, but this is subterfuge. The City's veiled goal is not to limit airport noise (even assuming that goal is within its powers), but to reduce the number and frequency of aircraft overflight, over which it definitively has no power.

This is not new. Beginning decades ago, the City declared war on aircraft by engaging in incremental acts which have restricted flight operations over time by chiseling away at flight operations of aircraft by various means. Initially, the City impermissibly banned early left turns in 1958. Then it purportedly limited the number of flight schools in 1977. In recent years, it escalated its campaign against aircraft with adopting a surge of impermissible restrictions on aircraft flight operations, which culminated in the City's imposition of landing fees, and ultimately with the adoption of the Touch & Go Ordinance. In doing so, the City intentionally thumbs its nose at federal authority and unlawfully intrudes into the government's jurisdiction. Although ZAPS is only challenging the Touch & Go Ordinance, it does not concede that the legitimacy of any of these other measures, some of which are actively being challenged by others.

The United States Government has exclusive sovereignty over the nation's airspace, which includes all of the sky. A subset of airspace, is navigable airspace, which is "airspace needed to ensure safety in the takeoff and landing of aircraft" and includes areas above 1,000 feet in congested areas (500 in uncongested areas) and areas necessary for takeoff and landing and includes the patterns at the Airport.

Federal authority to regulate aircraft and navigable airspace is very broad and a municipality, like the City, is very limited in its ability to regulate aircraft. The City is prohibited from regulating broad areas such as air safety or flight operations. Its ability to regulate aircraft is severely limited to just certain noise-based and environment restrictions, which are themselves constrained; for example, for certain aircraft, any local restrictions are subject to the strict requirements of the Airport Noise and Capacity Act ("ANCA"). 49 U.S.C. §§ 47521 *et seq*. As the Airport owner, the City does have proprietor rights that allow it to make certain ground-based noise restrictions that are reasonable, nonarbitrary, and nondiscriminatory. But this authority does not extend to

9

ORBACH HUFF & HENDERSON LLP

aircraft entering or exiting the flight pattern through takeoff and landing. Yet, the Touch & Go Ordinance exerts unlawful regulation over the Airport patterns. Further, the ordinance is preempted under conflict preemption because it conflicts with ANCA by impermissibly regulating certain types of aircraft without the City having complied with ANCA's procedural requirements.

As shown by the multitude of public comments, the Touch & Go Ordinance was not adopted to reduce noise emanating from ground level at the Airport, but for the improper and veiled purpose of limiting overflights. Neither Congress nor FAA has ceded federal authority to regulate, directly or indirectly, aircraft overflight in the patterns or airport takeoffs and landings in the navigable airspace to the state or local levels.

Although the City may want to limit flights to quell neighbors' complaints, it is prohibited from doing so under well-established law. Only the federal government can regulate overflights, and the City taking it upon itself to prohibit these flight maneuvers as a means of reducing overflights cannot stand. Accordingly, ZAPS requests this Court to grant a writ of mandate, declare the Touch & Go Ordinance invalid, and enjoin the City from regulating aircraft overflight through the Touch & Go Ordinance.

## II. <u>STATEMENT OF FACTS</u>

### A. <u>Torrance Municipal Airport</u>

On March 5, 1948, the United States executed a Quitclaim Deed to the City for a portion of the Airport, referred to as the Lomita Flight Strip. AR00001. As part of this Quitclaim Deed, the City was required to not "limit its usefulness as an airport." AR00005. On March 22, 1956, the United States and the City entered into a deed conveying the "lands or interests in lands" upon which the Airport sits to the City, on the condition that the City "will maintain the project constructed thereon." AR00009. This deed was accepted by the City on May 1, 1956. AR00015. The Airport is commonly known as Zamperini Field or Torrance Municipal Airport with the International Civil Aviation Organization identifier of KTOA. A variety of jet and

1  propeller aircraft use the Airport with stage ratings from stage 2 to stage 4, as well as

2  aircraft without stage ratings.[1] Declaration of Ivan Arnold ("Decl. Arnold"), at ¶ 9.

3  ### B.    ZAPS and Its Members

4      ZAPS is a California Unincorporated Association made up of Airport user

5  members, many of whom have aircraft that are subject to the Touch & Go Ordinance.

6  Decl. Arnold, at ¶¶ 1-8; Declaration of James Henry Gates ("Decl. Gates"), at ¶¶ 1-8.

7  One member of ZAPS operates a Saab SF-340A aircraft, which has a Stage 3 rating

8  from the FAA, and desires to perform those operations prohibited by the Touch & Go

9  Ordinance at the Airport. Decl. Arnold, at ¶¶ 5, 9.

10  ### C.    The City's Multi-Front Attack on Flying Aircraft

11      The City has unleashed a multi-front attack on flying aircraft by imposing

12  comprehensive restrictions over the years, which included a 6-flight school limitation,

13  instituting landing fees, and banning touch and goes, stop and goes, taxi backs, and low

14  approaches. In regard to the former, on October 25, 1977, under Subject 10, Airport

15  Noise Ordinance, the City Council adopted Resolution No. 77-215, a Resolution of the

16  City Council of the City of Torrance Reaffirming a Previously Adopted Policy to

17  Institute a Program of Aircraft Noise Abatement and Directing the City Manager and

18  Other City Officials to Take Certain Steps to Implement Such Program. AR00022. The

19  City sought to limit the volume of flights from the Airport to "a level compatible with

20  community tranquility…" *Id*. Resolution No. 77-215 limited the number of flight

21  schools to the current six operating and to "seek alternative training fields for training

22  flights, particularly touch and go and stop and go operations." AR00024.

23      Over the years, the City increased its efforts to restrict aircraft overflights:

24  - In November 1981, the City published the Torrance Municipal Airport Aircraft

---

[1] The "stage" rating of an aircraft is based on physical characteristics and noise levels. *See* 14 C.F.R. § 36.1(e)-(h). For civil aircraft, there are five stages identified, with Stage 1 being the loudest and Stage 5 being the quietest. Most stage-rated aircraft are jets and helicopters; most piston-powered aircraft are not assigned stage ratings.

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

Noise Control and Land Use Compatibility Study, which stated the City's intent to "initiate a comprehensive aircraft noise abatement program". AR00165, AR00189.

- On December 14, 2021, the City Council considered and awarded a $627,078 contract for an airport noise monitoring system based on numerous community complaints about flying aircraft from flight schools. AR01694-01726.

- On March 29, 2022, City Council listened to discussions on the Torrance Municipal Code section 51.2.3(e)'s previously enacted but unlawful prohibition on early left turns and the number of flights due to the flight schools at the Airport, which included numerous comments complaining about aircraft flying over homes and insisting that the City do something about it. AR01976-79, AR02555-77.

- On April 12, 2023, the City's Transportation Committee was presented with options to provide direction on reducing flights, which included imposing landing fees. AR04375-077, AR04381-90.

- On July 25, 2023, the City Council discussed how to best mitigate the noise and frequency of flights in the areas surrounding the Airport due to neighbor complaints about aircraft overflight. AR06683-89, AR06893-97, AR06920-7064. It passed a motion to modify the hours and days for allowed touch and goes. AR06897. For that hearing, the City's Staff Report stated, "The two general issues with noise impacts on the communities surrounding Torrance Airport are the high frequency of flights generated by flight schools, and the low flight altitude of aircraft turning to the southwest over noise-sensitive neighborhoods immediately after takeoff." AR06688.

- On September 12, 2023, the City Council considered banning touch and goes, hearing additional neighbor complaints about the noise from frequent aircraft overflight. AR07065-88.

- On October 17, 2023, City Council once again considered banning touch and

ORBACH HUFF & HENDERSON LLP

goes, hearing even more community complaints about noise from aircraft overflight. AR07786-87.

- On November 28, 2023, City Council presented language of a proposed ordinance on "Landing Fees Ordinance" and heard neighbor complaints about the noise from frequent overflight. AR07993-97, AR07999-8001, AR08003-9, AR08011-17, AR08019-22.

- On December 12, 2023, City Council adopted the Landing Fees Ordinance, as Ordinance No. 3927, which amended Torrance Municipal Code sections 51.2.30, "Definition of Revenue Operations" and 51.2.31, "Fee for Revenue Operations", and repealed section 51.2.32, "Refusal for Clearance." AR08556, AR08558-60.

- On December 19, 2023, City Council adopted Urgency Ordinance No. 3929, which amended the Torrance Municipal Code to limit business licenses for flight schools to only six licenses, which went into effect immediately. AR08650-54.

- On January 9, 2024, City Council adopted Ordinance No. 3929, which was a non-urgency version of Ordinance No. 3929, which also limit business licenses for flight schools to only six licenses. AR08909-11.

- On January 11, 2024, the Landing Fee Ordinance went into effect. AR08578.

- On January 23, 2024, City Council introduced and approved the Touch & Go Ordinance based on neighbor complaints of frequent and repetitive overflight. AR08927-31, AR08966-7, AR09032.

- On February 6, 2024, City Council adopted and passed the Touch & Go Ordinance, as Ordinance No. 3930, which amended Article 5 "Touch (and Stop) and Go, Full Stop-Taxi Back and Low Approaches" of Chapter 1, Division 5 of the Torrance Municipal Code. Thereafter, City promulgated Torrance Municipal Code sections 51.5.1 through 51.5.7 to implement Ordinance No. 3930. AR09271-2.

- On March 8, 2024, the Touch & Go Ordinance went into effect. AR09213-4.

///

ORBACH HUFF & HENDERSON LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORBACH HUFF & HENDERSON LLP

**D.**    **The FAA's Admonitions Against the City for its Prior Flight Restrictions**

In 2020 and 2022, the FAA admonished the City's restriction on aircraft flight. AR10065-67, AR10082-84. The FAA stated that the City cannot regulate flight; only the FAA can. *Id*. These admonitions related to the City's ban on early left turns in Torrance Municipal Code section 51.2.3(e) ("Left Turn Ban"), but the principles are of general applicability. AR05805-08; AR05816-18.

In its February 18, 2020 letter, the FAA stated that Left Turn Ban is unenforceable. The FAA explained:

> "Because the Torrance code provision applies to aircraft in flight, it is not consistent with the Federal statutory and regulatory framework described above. Enforcement of the provision would be at odds with various court opinions. As noted, state and local governments lack the authority to regulate airspace use, management and efficiency; air traffic control; and aircraft noise at its source. Federal courts have found that a navigable airspace free from inconsistent state and local restrictions is essential to the maintenance of a safe and sound air transportation system."

AR10067. The City responded by claiming its Left Turn Ban was "grandfathered" in. AR05812-13. However, in a subsequent letter dated December 16, 2022, the FAA flatly rejected the City's claim. AR10083. The FAA unequivocally told the City that it was subject to ANCA and could not add additional flight limits not compliant with the ANCA – which would prohibit the restriction now at issue. Despite this admonition, the City ignored the FAA and adopted the Touch & Go Ordinance to reduce aircraft overflight.

**E.**    **The Touch & Go Ordinance**

The Touch & Go Ordinance prohibited and restricted certain flight maneuvers that are frequently used in training.[2] These included:

- Touch and Go: "an action by an aircraft consisting of a landing and departure on

---

[2] The FAA in its Airport Compliance Manual - Order 5190.6B - Change 3 and Aeronautical Information Manual (AIM) Basic ("**AIM**") acknowledges that touch and goes are legitimate flight maneuvers. AR07383; AIM 4-3-23.

14

a runway without stopping or exiting the runway." AR09213, AR09271.

- Stop and Go: "an action by an aircraft consisting of a landing followed by a complete stop on the runway and a takeoff from that point." *Id*.

- Full Stop-Taxi Back: "an action by an aircraft consisting of a landing on any runway followed by exiting the runway, with or without a complete stop, and returning directly to the approach end of any runway for a subsequent take-off." *Id*.

- Low Approach: "an action by an aircraft consisting of an approach over the Airport for a landing where the pilot intentionally does not make contact with the runway." *Id*.

The Touch & Go Ordinance prohibits touch-and-go and stop-and-go maneuvers at the Airport. AR09271. It also restricted days and times for which low approach and full stop taxi-back maneuvers could be performed to only non-holiday, weekdays between the hours of 10:00 a.m. and 6:00 p.m. AR09272. The touch-and-go, stop-and-go, low approach, and full stop taxi-back maneuvers are collectively referred to as "Flight Maneuvers". As defined by the ordinance, an aircraft initiating a low approach maneuver never leaves the airspace or otherwise make contact with the runway and the full stop-taxi back is the only flight maneuver that involves taxiing off the runway, before promptly taking off again.

### III.    PROCEDURAL HISTORY

ZAPS has exhausted its administrative remedies prior to filing suit. Members and entities that were, and are, members of ZAPS objected to the City's adoption of ordinances designed to regulate flying aircraft that culminated in the Touch & Go Ordinance. Decl. Gates ¶ 9; AR01990, AR02013, AR02016, AR02102, AR03102, AR12735, AR06401, AR06457, AR07083, AR07084, AR07927, AR08987, AR08950, AR08927, AR08935, AR09010, AR09012, AR08947.

On April 22, 2024, ZAPS filed a Verified Petition for Writs challenging the validity of the Touch & Go Ordinance ("Petition") and commenced this action in the

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

Superior Court of the State of California, County of Los Angeles entitled *Zamperini Airfield Preservation Society v. City of Torrence*, as Case Number 24STCP01278.

On May, 31, 2024, the City filed a Notice of Removal based on federal question jurisdiction. Dkt. 1. ZAPS did not contest the removal. On November 9, 2024, the City answered the Petition. Dkt. 14. On February 6, 2025, the City certified the Administrative Record for this action. Dkt. 22.

## IV.    <u>OTHER CHALLENGES TO THE CITY'S ACTIONS</u>

ZAPS is not the only entity challenging the City's campaign against aircraft overflight. On March 8, 2024, the Torrance Airport Association, a local chapter of the California Pilots Association, filed a Verified Petition for Writ of Mandate challenging the validity of the City's Landing Fees Ordinance in the Superior Court of the State of California, County of Los Angeles entitled *Torrance Airport Association, Chapter of California Pilots Association v. City of Torrance*, as Case Number 24STCP00729.

On April 3, 2024, the City also filed a Notice of Removal based on federal question jurisdiction, which removed the case to the United States District Court, Central District of California as Case Number 2:24-cv-02692-JFW-MBK. That matter is still pending.

## V.    <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction to hear the Motion based on 28 U.S.C. § 1331. "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96, (1983). The Court also has supplemental jurisdiction to hear additional claims that are related to an original claim, even if the court would not normally have jurisdiction over those additional claims. 28 U.S.C. § 1367. That supplemental jurisdiction extends to ZAPS's writ of mandate claims under California Code of Civil Procedure sections 1085 and 1094.5. "A grant of supplemental

16

ORBACH HUFF & HENDERSON LLP

jurisdiction of a California mandamus action is not prohibited." *Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160, 1184 (E.D. Cal. 2013), citing *Manufactured Home Communities, Inc. v. City of San Jose*, 420 F.3d 1022, 1027 n. 6 (9th Cir.2005). Where a mandamus action seeks to enforce a federal right, federal courts may retain supplemental jurisdiction over a state writ petition. *Tulare Loc. Health Care Dist. v. California Dep't of Health Care Servs.*, 328 F. Supp. 3d 988, 990 (N.D. Cal. 2018) (noting that district court denied motion to remand petition for writ of mandate under § 1085 where petition "raised a number of issues of federal law"). Even if there is no private right of enforcement, under the doctrine of *Ex Parte Young*, parties are not barred from invoking federal jurisdiction when "they do so not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements." *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 146 (2d Cir. 2016), citing *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 222 (2d Cir. 2008) (pre-enforcement challenge to pre-empted state law presented no "barriers to justiciability").

Venue is proper in this Court per California Code of Civil Procedure section 395, subdivision (a) as the acts and omissions complained of herein occurred, and the property affected by those acts is located in Los Angeles County.

ZAPS is an aggrieved person, as a person who through a representative, appeared at the public meetings and hearings of the City Council and objected to the City's adoption of the Touch & Go Ordinance and promulgation of its implementing Torrance Municipal Code sections 51.5.1 through 51.5.7. Decl. Gates ¶ 9. An ordinance is a legislative act that is reviewable by writ of mandate. *Yes in My Back Yard v. City of Culver City*, 96 Cal.App.5th 1103, 1112-13 (2023).

This action is commenced within the time limits imposed for this action under California Code of Civil Procedure sections 1085 and 1094.5.

/ / /

/ / /

ORBACH HUFF & HENDERSON LLP

## VI.    <u>STANDARD OF REVIEW</u>

ZAPS seeks adjudication of a federal question under applicable state law and remedy for a peremptory writ ordering the City to vacate and repeal the Touch & Go Ordinance. There is no direct analog or corresponding statute for judicial review of a municipality's actions under federal law. Under California law, "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." *Cal. Hotel & Motel Assn. v. Indus. Welfare Com.*, 25 Cal.3d 200, 212 (1979). This is analogous to judicial review of agency actions under 5 U.S.C. § 706, which permits the court to:

> "[H]old unlawful and set aside agency action, findings, and conclusions found to be—
>
> "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

5 U.S.C. § 706(b). The Court's review of the City's actions should include the additional considerations under this section, including subdivisions (A) through (E).

This Court can enjoin the Touch & Go Ordinance though its authority under the All Writs Act. 28 U.S.C. § 1651(a). Moreover, federal courts can preemptively enjoin state acts. "The Supreme Court has 'long recognized' that where 'individual[s] claim[ ] federal law immunizes [them] from state regulation, the court may issue an injunction

ORBACH HUFF & HENDERSON LLP

upon finding the state regulatory actions preempted.'" *Friends of the E. Hampton Airport, Inc.*, 841 F.3d at 144, quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). The "Eleventh Amendment does not bar federal courts from enjoining state officials from taking official action claimed to violate federal law. Since then, the Supreme Court has consistently recognized federal jurisdiction over declaratory- and injunctive-relief actions to prohibit the enforcement of state or municipal orders alleged to violate federal law." *Id*., citing numerous Supreme Court cases.

Furthermore, since there is no direct analog under federal law for the adjudication of a claim for writ of mandate, the Court should treat ZAPS's claims in its Petition as seeking declaratory judgment. "In a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *Calderon v. Ashmus*, 523 U.S. 740, 745-46 (1998); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). A private party may seek declaratory and injunctive relief against state action on the basis of federal preemption where a federal right exists. *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 929 (9th Cir. 2003). "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202. These authorize this Court to adjudicate and issue the same judgment and remedy ZAPS seeks under its Petition. ZAPS has provided reasonable notice, both through its Petition and through the Motion.

## VII.  **LEGAL ARGUMENT**

The City, though the City Council, adopted the Touch & Go Ordinance for the sole improper purpose of restraining the frequency of aircraft flight over neighborhoods near the Airport. The City was exclusively motivated by the vast amount of neighbor complaints about the frequency of overflights. However, the City cannot adopt an

ORBACH HUFF & HENDERSON LLP

1    ordinance that affects aircraft in flight after takeoff or before landing. It must comply

2    with the law, in this instance, federal law.

3        The Touch & Go Ordinance is void because it was for the improper purpose to

4    limit aircraft overflight, which impermissibly infringes on the federal government's

5    exclusive sovereignty over the navigable airspace and is preempted because it regulates

6    the fields of flight operations and air safety for which Congress and the FAA occupy

7    those fields. Even if the Touch & Go Ordinance is not void under field preemption, it

8    would be void under conflict preemption because it directly conflicts with ANCA. The

9    City failed to comply with the procedures set forth in ANCA and did not have any legal

10   basis for its failure to comply. Although the City is permitted to enact noise restrictions

11   at the Airport per its proprietor's rights, those restrictions do not extend to overflight.

12   Clearly, the City has no basis for its ban and restrictions on the flight maneuvers.

13   Therefore, the Court should invalidate the Touch & Go Ordinance.

14       **A.    <u>The Federal Government's "Exclusive Sovereignty" Over the</u>**

15       **<u>County's Airspace Categorically Prevents the City from Enforcing</u>**

16       **<u>the Touch & Go Ordinance</u>**

17       The Supremacy Clause states, "[The] Constitution, and the Laws of the United

18   States which shall be made in Pursuance thereof…shall be the supreme Law of the

19   Land…" U.S. Const. art. VI, cl. 2. From this authority, Congress provided for the

20   expansive authority for the federal government to regulate airspace and aircraft

21   transiting it. "The United States Government has ***exclusive sovereignty of airspace*** of

22   the United States." 49 U.S.C. § 40103(a) ("Section 40103"). This is unique compared

23   to other federal law in that it uses the express language of "exclusive sovereignty",

24   which is notably absent from most legislation.

25       Since 1926, under federal law, "the United States has 'complete and exclusive

26   national sovereignty in the air space' over this country." *United States v. Causby*, 328

27   U.S. 256, 260 (1946), citing the Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. §

28   171 *et seq*., as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C.

ORBACH HUFF & HENDERSON LLP

ORBACH HUFF & HENDERSON LLP

§ 401 *et seq*. "With the passage of the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq., Congress expressed the view that the control of aviation should rest exclusively in the hands of the federal government." *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 404 (7th Cir. 1974). As stated by the Ninth Circuit, "We think the federal power to regulate airspace is as complete and as valid as the federal power, to the extent it rests upon the commerce clause, to regulate navigable waters." *United States v. Helsley*, 615 F.2d 784, 786 (9th Cir. 1979). The Ninth Circuit elaborated:

> "In reporting the bill which became the Air Commerce Act, the Congress said: [¶] The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or nonnavigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil."

*Id*. at 786, n. 1. Navigable airspace is even more paramount. "Air is an element in which to navigate is even more inevitably federalized by the commerce clause then in navigable water." *Kohr* at 404.

> "The explicit objective of the [Federal Aviation Act] is to foster the development of air commerce. 49 U.S.C. § 1346. To that end, it has been recognized that the principal purpose of the [Federal Aviation] Act is to create one unified system of flight rules and to centralize in the Administrator of the [FAA] the power to promulgate rules for the safe and efficient use of the country's airspace."

*Kohr* at 404. The court found a "predominant, indeed almost exclusive, interest of the federal government in regulating the affairs of the nation's airways." *Id*. at 403.

In 1994, as part of recodification, Congress shortened the phrasing of "complete and exclusive national sovereignty in the air space" to the more concise "exclusive sovereignty". And to carry out that power, Congress directed, the FAA to "develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." 49 U.S.C. § 40103(b)(2).

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

These authorities together with Section 40103 are essentially preemption plus with the full weight and authority of the Supremacy Clause behind it that is only limited to the extent the federal government has ceded or divested itself of that broad authority. This authority applies to the "navigable airspace", which federal law defines as "airspace needed to ensure safety in the takeoff and landing of aircraft." 49 U.S.C. § 40102(a)(30). The navigable airspace includes areas above 1,000 and 500 feet in congested areas and uncongested areas, respectively, and areas necessary for take-off and landing. 49 U.S.C. § 40102(a)(32); 14 C.F.R. § 91.119.

The Touch & Go Ordinance impermissibly intrudes into the navigable airspace. It expressly regulates "areas necessary for take-off and landing" based on an improper intent to regulate aircraft flight.

1. The Federal Government Maintains Its Sovereignty Over Flight Maneuvers that are Impermissibly Banned and Restricted By the Touch & Go Ordinance

Although the federal government has ceded some of its "complete" authority to regulate navigable airspace, not involved here, it still retains the original sovereignty, which was conferred in full onto the FAA to administer. The ceding of sovereignty over time by statutes that divest control is akin to "inherent sovereignty" of Indian tribes.

Indian tribes have inherent sovereignty that can be diminished or divested through its own acts that cede its sovereignty. Indian tribes, though incorporation into the United States though treaties, lost much of their inherent sovereignty. *Montana v. U.S.*, 450 U.S. 544, 563(1981). Like the inherent sovereignty retained by the Indian tribes, the federal government retains its exclusive sovereignty over the navigable airspace. Only the specific sovereignty that has been ceded by the federal government, either expressly or implicitly, limits its sovereignty. The federal government has not ceded the authority to regulate and prohibit the banned flight maneuvers.

The authority of municipalities, like the City, is even more diminished. "[C]ities are not sovereign entities. Rather, they have been traditionally regarded as subordinate

ORBACH HUFF & HENDERSON LLP

governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *U.S. v. Wheeler*, 435 U.S. 313, 320 (1978), quotations and citations omitted, other holdings superseded by statute. A city is nothing more than "an agency of the State." *Williams v. Eggleston*, 170 U.S. 304, 310 (1898).

The City, which does not have its own sovereignty, is even more limited in ability to regulate navigable airspace.

> "The moment a ship taxies onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government."

*Nw. Airlines v. State of Minnesota*, 322 U.S. 292, 303 (1944). To the extent an aspect of the federal government's ability to regulate navigable airspace is not expressly ceded to the states, any attempt by a state or local municipality to regulate it is preempted based on the express exclusive sovereignty provision of Section 40103. The federal government has never ceded its sovereignty to regulate the Flight Maneuvers. As discussed in Section VII.C.1. below, the federal government staunchly controls regulation of flight safety and operations. In fact, the FAA's Airport Compliance Manual ("ACM") and AIM identify the Flight Maneuvers as valid training maneuvers. AR07383; AIM 4-3-23.

## B.    The Touch & Go Ordinance Regulates Overflight that Follows FAA Flight Patterns

Flight pattern regulation by the FAA is extensive and is discussed in detail in the FAA's AIM. "The FAA is responsible for ensuring the safe, efficient, and secure use of the Nation's airspace, by military as well as civil aviation, for promoting safety in air commerce, for encouraging and developing civil aeronautics, including new aviation technology, and for supporting the requirements of national defense." *Id*. at 17. "[The AIM] is designed to provide the aviation community with basic flight information and ATC procedures for use in the National Airspace System (NAS) of the United States."

AIM at 17.

The AIM includes a section on Airport Operations, which discusses traffic patterns. *See* AIM 4-3, Airport Operations. Generally: "Increased traffic congestion, aircraft in climb and descent attitudes, and pilot preoccupation with cockpit duties are some factors that increase the hazardous accident potential near the airport. … This section defines some rules, practices, and procedures that pilots should be familiar with and adhere to for safe airport operations." AIM 4-3-1, General.

The standard traffic pattern consists of six legs (all typically flown with left-hand turns, unless otherwise specified): 1) Upwind leg: A flight path parallel to the landing runway in the direction of landing; 2) Crosswind Leg: A flight path at right angles to the landing runway off its takeoff end; 3) Downwind leg: A flight path parallel to the landing runway in the opposite direction of landing; 4) Base Leg: A flight path at right angles to the landing runway off its approach end and extending from the downwind leg to the intersection of the extended runway centerline; 5) Final Approach Leg: A flight path in the direction of landing along the extended runway centerline from the base leg to the runway; and 6) Departure Leg: Begins after takeoff and continues straight ahead along the runway heading, with climbing until reaching a point at least 1/2 mile beyond the departure end of the runway and within 300 feet of the traffic pattern altitude. AIM 4-3-3, Traffic Patterns. "However, in all instances, an appropriate clearance must be received from the tower before landing." AIM 4-3-2.b., Airports with an Operating Control Tower.



AIM FIG 4-3-1, Components of a Traffic Pattern.

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

The pattern altitude at the Airport is 1,100 feet Mean Sea Level ("MSL") for single-engine aircraft and 1,500 feet MSL for twin engine. AR02004. The North and South patterns at the Airport are depicted in AR02191 and AR02201.

The AIM includes a specific "Cleared for the Option" for flight operations that permits "an instructor, flight examiner or pilot the option to make a touch-and-go, low approach, missed approach, stop-and-go, or full stop landing." AIM 4-3-23, Option Approach. "After ATC approval of the option, the pilot should inform ATC as soon as possible of any delay on the runway during their stop-and-go or full stop landing." *Id*. "This procedure will only be used at those locations with an operational control tower and will be subject to ATC approval." *Id*. Since the Airport has an operational control tower, the Touch & Go Ordinance runs afoul of the Cleared for the Option procedure. These maneuvers are typical for safety training since they allow student pilots to practice multiple takeoffs and landings in a short period. *See, e.g., Id*. Landing is one of the most complex phases of flight, so frequent repetition improves skill and confidence.

The City stated it "recognizes that the [] FAA is responsible for handling all aircraft flight patterns…" AR01977. However, the City's improper motive is evidenced through proceedings leading to the ordinance's adoption. Public comment on the ordinance by neighbors included:

> "The Walteria neighborhood has been bombarded by south training pattern flights from flight schools that occur so frequently and without interruption, that I have lost any interest in sitting outside on my balcony or in my backyard to enjoy the home I worked so hard to buy. When one plane takes off from the airport to my north to begin a loop, another is inevitably flying over Walteria in the south pattern halfway through its loop. This cyclical pattern of training creates non-stop droning that reverberates off the PV hillside and surrounds me on all sides for as much as an hour at a time."

AR02105. Another neighbor asked the City to "stop all training in the South Pattern and enforce the City's no-left-turn rule to keep planes away from quiet residential

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

neighborhoods."[3] AR02118. There are hundreds of complaints about aircraft overflight. In response to these complaints, the City adopted the Touch & Go Ordinance, despite knowing it lacked the direct authority to do so.

The real reason the City adopted the ordinance was to reduce traffic in the patterns. The City's motivation to regulate aircraft traffic patterns is an improper purpose. In addition to evidence that the City intended to regulate the aircraft traffic pattern, there is evidence of the City's improper purpose to regulate flight operations generally throughout the Administrative Record. The City systematically restricted flight operations over the years based on neighbor complaints of aircraft overflight. Motivated by these numerous complaints from neighbors about the frequency of noise from aircraft flying overhead, the City eventually sought to limit those flights by banning and restricting legitimate and permissible flight maneuvers by, in part, adopting the Touch & Go Ordinance.[4]

**C.      The Touch & Go Ordinance Is Preempted by Federal Law**

Congress' power to preempt state law derives from the Supremacy Clause of the United States Constitution. *Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625, 630 (2012). It states: "[t]he Constitution and laws of the United States which shall be made in Pursuance thereof…shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. It "invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985), citations and quotations omitted. A state law which conflicts with federal law is preempted or "without effect". *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

"Federal law may preempt state law in three ways. First, 'Congress may withdraw

---

[3] The City's enforcement of the Left Turn Ban was expressly prohibited by the FAA. AR05805-06; AR05816-18.

[4] The Administrative Record is replete with evidence that the City Council was concerned with the frequency of flights based on neighbor complaints. This intent to limit flights is also evidenced by the City Council deliberating landing fees while many pilots were away at a conference. AR 396.

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

specified powers from the States by enacting a statute containing an express preemption provision.' [cite] Second, 'States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.' [cite] Finally, 'state laws are preempted when they conflict with federal law,' such that 'compliance with both federal and state regulations is a physical impossibility, ... [or] the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [cite]" *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016), quoting *Arizona v. United States*, 567 U.S. 387 (2012). Although preemption is based on the intent of Congress, that intent is "more readily inferred in the field of aviation because it is an area of the law where the federal interest is dominant." *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016), citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Even when this is no express provision of preemption, "the federal interest can be so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject…Or the state policy may produce a result inconsistent with the objective of the federal statute." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973), quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). There are two types of implied preemption: field and conflict preemption. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007); *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1006 (9th Cir. 2013). Preemption under the Federal Aviation Act has historically focused on field preemption, but for the Touch & Go Ordinance, it is also preempted since it conflicts with ANCA.

1. The Touch & Go Ordinance is Preempted Because Congress Has Regulated the Fields of Air Safety and Flight Operations

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). The intent to displace

ORBACH HUFF & HENDERSON LLP

state law can be "inferred from a framework of regulation so pervasive…that Congress left no room for the States to supplement it or where there is a federal interest…so dominant that the federal system will assume to preclude enforcement of state laws on the same subject." *Ibid*, quotations and citations omitted. This is known as field preemption.

"The essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme. The first step in determining whether that situation exists is to delineate the pertinent regulatory field; the second is to survey the scope of the federal regulation within that field." *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734 (9th Cir. 2016).

Congress has conferred on the FAA authority to "prescribe air traffic regulations on the flight of aircraft" for "navigating…aircraft", "protecting individuals and property on the ground", and "using the navigable airspace efficiently". 49 U.S.C. § 40103(b)(2). Moreover, the FAA shall expressly consider "controlling the use of the navigable airspace and regulating civil and military operations in that airspace in the interest of the safety and efficiency of both of those operations." 49 U.S.C. § 40101(d)(4). "Congress intended to invest the Administrator of the [FAA] with the authority to enact exclusive air safety standards. Moreover, the Administrator has chosen to exercise this authority by issuing such pervasive regulations that we can infer a preemptive intent to displace all state law on the subject of air safety." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 472 (9th Cir. 2007).

"[F]ederal law occupies the entire field of aviation safety." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007); *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1128 (9th Cir. 2021). "Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety." *Montalvo*, 508 F.3d at 473. Further, federal regulation of aircraft noise and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORBACH HUFF & HENDERSON LLP

restrictions preempts state and local authority to regulate flight operations in order to address noise concerns. *City of Burbank*, 411 U.S. at 638; *Arapahoe County Pub. Airport Auth. v. FAA,* 242 F.3d 1213, 1220-21 (10th Cir. 2001). "Where Congress occupies an entire field…even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.

The Touch & Go Ordinance prohibits and restricts flight maneuvers that relate to flight operations and air safety standards. Those maneuvers are specifically acknowledged by the FAA as legitimate training maneuvers. AR07383; AIM 4-3-23. The Administrative Record is replete with public call to ban or severely limit overflight and flight in the pattern. AR08938, AR08943, AR08949, AR09014, AR09019, AR09134, AR09135, AR09137, AR09165, AR09187, AR09222, AR10089, AR10093, AR10102, AR10150, AR10587, AR10594, AR10603, AR10748, AR10749, AR10835, AR10958, AR11359, AR11365, AR11367, AR11372, AR11392, AR11600, AR11816, AR11873, AR11874, AR11900, AR12447, AR12451, AR12495, AR12575, AR12588, AR12595, AR12596, AR12620, AR12623, AR12624, AR12662, AR12672, AR12679, AR12682, AR12692, AR12723, AR12725, AR12729, AR12734-12737, AR12745, AR12842, AR13056, AR13416, AR13456, AR13513, AR13524, AR13570, AR13639, AR13662, AR14247-49, AR15608, AR15874, AR15881 ("Pattern Complaints"). There are at least 294 separate instances in the Administrative Record where members of the public complained about noise from overflight. AR01720, AR02005, AR02021, AR02022, AR02025, AR02033, AR02084, AR02104, AR02110, AR02111, AR02121, AR02124, AR02126, AR02127, AR02128, AR02133, AR02138, AR02140, AR02143, AR02144, AR02148, AR02157, AR02166, AR02171, AR02227, AR02228, AR02234, AR02247, AR02252, AR02255, AR02256, AR02257, AR02258, AR02260, AR02269, AR02270, AR02271, AR02272, AR02274, AR02281, AR02283, AR02284, AR02286, AR02291, AR02292, AR02294, AR02296, AR02310, AR02312, AR02324, AR02327, AR02359, AR02368, AR02469, AR02520, AR02557, AR02566, AR02568, AR02680,

ORBACH HUFF & HENDERSON LLP

AR03447, AR03456, AR03475, AR03484, AR03490, AR03491, AR03492, AR03502,
AR03508, AR03515, AR03520, AR03571, AR03580, AR03646, AR03647, AR03649,
AR03653, AR03663, AR03666, AR03668, AR03669, AR03670, AR03675, AR03682,
AR03685, AR03686, AR03690, AR03699, AR03701, AR03708, AR03713, AR03769,
AR03770, AR03776, AR03789, AR03794, AR03797, AR03798, AR03799, AR03800,
AR03802, AR03811, AR03812, AR03813, AR03814, AR03816, AR03820, AR03823,
AR03825, AR03826, AR03828, AR03833, AR03834, AR03835, AR03836, AR03837,
AR03838, AR03852, AR03854, AR03869, AR03928, AR03940, AR03941, AR04308,
AR04329, AR04348, AR04396, AR04405, AR04407, AR05286, AR05295, AR05314,
AR05323, AR05329, AR05330, AR05331, AR05340, AR05341, AR05347, AR05354,
AR05358, AR05410, AR05419, AR05485, AR05486, AR05488, AR05491, AR05492,
AR05502, AR05505, AR05507, AR05508, AR05509, AR05514, AR05519, AR05521,
AR05524, AR05525, AR05529, AR05538, AR05540, AR05547, AR05552, AR05608,
AR05615, AR05628, AR05633, AR05636, AR05637, AR05638, AR05639, AR05641,
AR05650, AR05651, AR05652, AR05653, AR05655, AR05659, AR05664, AR05665,
AR05667, AR05672, AR05673, AR05677, AR05691, AR05693, AR05708, AR05767,
AR05779, AR05780, AR05783, AR05831, AR05932, AR05933, AR05945, AR05982,
AR05988, AR06027, AR06032, AR06040, AR06119, AR06234, AR06274, AR06337,
AR06364, AR06437, AR06626, AR06633, AR06634, AR06636, AR06704, AR06706,
AR06830, AR06837, AR06930, AR06978, AR07002, AR07073, AR07200, AR07693,
AR07819, AR07829, AR07844, AR07861, AR07868, AR10091, AR10796, AR10824,
AR10832, AR10955, AR10956, AR10958, AR10963, AR10964, AR11148, AR11149,
AR11151, AR11156, AR11157, AR11369, AR11370, AR11381, AR11388, AR11618,
AR11622, AR11623, AR11657, AR11710, AR11713, AR11720, AR11802, AR11811,
AR11812, AR12296, AR12395, AR12408, AR12445, AR12451, AR12490, AR12503,
AR12634, AR12680, AR12701, AR12720, AR12785, AR12794, AR12813, AR12897,
AR12909, AR12918, AR12928, AR12937, AR13657, AR13659, AR13674, AR13680,
AR13802, AR13804, AR13819, AR13825, AR14094, AR14096, AR14111, AR14117,

30

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

1    AR14368, AR14370, AR14385, AR14690, AR14692, AR14707, AR14713, AR14922,

2    AR14924, AR14939, AR14945 ("Overflight Complaints").

3         Facially, the Touch & Go Ordinance regulates specific flight maneuvers that are

4    under the purview of the FAA. Although airport proprietors have limited authority to

5    regulate noise from the airport, the Touch & Go Ordinance makes no reference to noise.

6    Instead, it is a blatant restriction on certain FAA approved flight maneuvers, which

7    amounts to restrictions on flight operations and air safety. Clearly, Congress and the

8    FAA have pervasively regulated these fields. Field preemption applies when the area of

9    aviation commerce and safety implicated is governed by pervasive federal regulations.

10   *Gilstrap v. United Air Lines, Inc.*, 709 F3d 995, 1006 (9th Cir. 2013). Congress has

11   occupied the field of flight operations and safety, which includes the flight maneuvers

12   banned and restricted under the Touch & Go Ordinance. Only the FAA, with the broad

13   authority granted to it by Congress, can ban, restrict, or otherwise regulate the

14   maneuvers. Therefore, the Touch & Go Ordinance is void based on field preemption.

15              2.    The Touch & Go Ordinance Is Also Preempted Because It

16                    Conflicts with ANCA

17        The Touch & Go Ordinance is further void under conflict preemption because it

18   directly conflicts with ANCA by regulating certain aircraft within its purview. A state

19   or local law is preempted "to the extent of any conflict with a federal statute." *Hillman

20   v. Maretta*, 569 U.S. 483, 490 (2013), citing *Hines v. Davidowitz*, 312 U.S. 52, 66–67

21   (1941); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and

22   Development Comm'n*, 461 U.S. 190, 204 (1983). "Such a conflict occurs when

23   compliance with both federal and state regulations is impossible, or when the state law

24   stands as an obstacle to the accomplishment and execution of the full purposes and

25   objectives of Congress." *Hillman v. Maretta*, 569 U.S. 483, 490 (2013), citations and

26   quotations omitted. "What is a sufficient obstacle is determined by examining the

27   federal statute and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign

28   Trade Council*, 530 U.S. 363, 363 (2000). When "it undermines the intended purpose

ORBACH HUFF & HENDERSON LLP

31

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

and natural effect" of a federal statute, it is such an obstacle. *Id.*, 530 U.S. at 363.

In 1990, Congress adopted ANCA because Congress specifically found that "community noise concerns have led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system" and "a noise policy must be carried out at the national level." 49 U.S.C. §§ 47521(3), (4). ANCA prohibits "airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft" unless those restrictions meet specific statutory requirements, including FAA approval for restrictions on stage 2 and 3 aircraft. 49 U.S.C. § 47524. Stage 3 aircraft use the Airport. *See* Decl. Arnold ¶¶ 5-9. Moreover, it does not specifically exempt stage 4 aircraft from its general requirements.

The purpose of ANCA was to limit state and local authorities from passing conflicting noise policies and required them to meet strict requirements for passing noise and access restrictions. To implement an access restriction on aircraft within the scope of the ANCA, the City was required to meet explicit requirements for implementing any restrictions. *See* 49 U.S.C. § 47524. For stage 2 aircraft, the City was required to comply with specific noise, economic cost-benefit analysis, and public comment requirements. 49 U.S.C. § 47524(b). This involved publication of notice in a newspaper and written notice to numerous parties, including the FAA. 14 C.F.R. § 161.203. The City was also required to provide analysis of the proposed restriction and alternatives. 14 C.F.R. § 161.205. For stage 3 aircraft, the City was required to meet even stricter requirements. Noise and access restrictions on the operation of stage 3 aircraft are only effective if "agreed to by the airport proprietor and all aircraft operators or has been submitted to and approved by the Secretary of Transportation after an airport or aircraft operator's request for approval…" 49 U.S.C. § 47524(c)(1). This applies to noise restrictions, restrictions on hours of operations, and "any other restriction on stage 3 aircraft." 49 U.S.C. § 47524(c)(1). The City was also required to submit analysis and satisfy six conditions for the proposed restrictions. 14 C.F.R. § 161.305. Approval by the Secretary of Transportation requires a finding based on

32

substantial evidence that:

"(A) the restriction is reasonable, nonarbitrary, and nondiscriminatory;

(B) the restriction does not create an unreasonable burden on interstate or foreign commerce;

(C) the restriction is not inconsistent with maintaining the safe and efficient use of the navigable airspace;

(D) the restriction does not conflict with a law or regulation of the United States;

(E) an adequate opportunity has been provided for public comment on the restriction; and

(F) the restriction does not create an unreasonable burden on the national aviation system."

49 U.S.C. § 47524(c)(2).[5] There are also the same notice requirements as stage 2 aircraft restrictions. 14 C.F.R. § 161.303.

### a.   *The City Failed to Comply with the ANCA*

The federal government permits an airport proprietor to set reasonable noise restrictions on certain stage aircraft, provided those restrictions meet the strict requirements. ANCA expressly refers to access restrictions and not just noise restrictions. This is significant because access restrictions like the City's Touch & Go Ordinance can be used to limit noise while not specifically referring to noise or noise levels. The Touch & Go Ordinance intended restriction of noise from flying aircraft is only permissible to the extent it does not conflict with and is permitted by ANCA.

Although the Touch & Go Ordinance does not specifically reference noise, it is clear that the City intended it to decrease noise by reducing the frequency of overflights. This is demonstrated by constant complaints and demands by neighbors at public hearings leading up to the adoption of the Touch & Go Ordinance to eliminate or severely limit aircraft overflight. *See* Pattern Complaints and Overflight Complaints, Section VII.C.1., *supra*. But aircraft noise is regulated by ANCA for certain staged

---

[5] This standard aligns with the standard for judicial review of agency actions under 5 U.S.C. § 706, that ZAPS believes should apply here.

ORBACH HUFF & HENDERSON LLP

aircraft. However, the Touch & Go Ordinance makes no distinction as to the stage of aircraft it applies to, so it applies to all stages. Restrictions on stage 2 and 3 aircraft are expressly subject to ANCA's requirements. Even if the City were to expressly exclude stage 2 and 3 aircraft, the Touch & Go Ordinance would still be unenforceable because that would create an exclusive right for the aircraft allowed to conduct the otherwise prohibited maneuvers, in violation of 49 U.S.C. section 40103(e).

The City failed to comply with any of ANCA's requirements for regulating stage 2 and 3 aircraft noise. Nothing in the Administrative Record evidences that the City complied with these requirements. In fact, the City's own analysis of ANCA compliance admits that it would not be able to pass an ANCA compliant ordinance that restricted stage 2 and 3 aircraft. AR04386. Significantly, the City staff stated that for the regulation of stage 3 aircraft: "It should be noted that condition 6 (that the restriction will not create an undue burden on the national aviation system) will be challenging for the City to overcome as any prohibition on training flights at the Airport will cause congestion at the nearby airports (LAX, John Wayne, and Long Beach)." AR04386. Staff further noted that: "The ANCA approval process is extremely costly, lengthy, and challenging, and as far as the Stage 3 restriction, no airport has been successful in getting it approved by the FAA." AR04386. The City has expressly admitted that the Touch & Go Ordinance fails to comply with ANCA for stage 2 and 3 aircraft.

The City did not secure FAA approval to regulate stage 3 aircraft nor comply with the requirements for regulating stage 2 aircraft. *See* 49 U.S.C. §§ 47524(b), (c). Stage 3 aircraft operate at the Airport and are subject to the restrictions of the Touch & Go Ordinance. The public, including members of ZAPS, operate stage 3 aircraft at the Airport. Decl. Arnold, ¶ 5. The Touch & Go Ordinance directly conflicts with ANCA because it regulates stage 3 aircraft without obtaining FAA approval. The restrictions regulate stage 2 aircraft, which currently use the Airport, or may use it in the future. Accordingly, the Touch & Go Ordinance is preempted because it conflicts with the express provisions of ANCA.

b.    *Labeling the Flight Restriction as a "Safety-Based Restriction" Does Not Prevent Preemption*

The City knew it would not be permitted to pass an ordinance like the Touch & Go Ordinance since it would not be compliant with ANCA. AR04386. City staff expressly determined that the City could not comply with the ANCA for the passage of the Touch & Go Ordinance. *Id*. So instead, it merely labeled the ordinance a "safety-based restriction" in order to adopt a restriction that directly conflicted with ANCA. AR04386-87. This is form over function. The City cannot escape the requirements of ANCA for restrictions that are clearly intended to address noise from flying aircraft. Moreover, only the FAA regulates safety. The City has no power to regulate flight maneuvers based on safety.

This creative labeling does not alleviate the fact that the Touch & Go Ordinance undermines the intended purpose of ANCA and is therefore "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillman*, 569 U.S. at 490. Just because the City does not wish to follow ANCA procedures, does not mean that ANCA does not apply. By not following those procedures and restricting stage 3 aircraft, the Touch & Go Ordinance is in express conflict with the intended purpose of the ANCA. The City cannot escape the requirements of the ANCA merely by labeling it a "Safety-Based Restriction". It is still a noise-based restriction on aircraft operations. This is highlighted by the swell of public concern fomented in the adoption of the Touch & Go Ordinance to limit the noise and frequency of aircraft overflight, not for safety.

D.    **Local Noise Restrictions that Limit Aircraft Operations Are Consistently Held to Be Preempted by Courts**

There are numerous instances where federal courts have invalidated local restrictions on aircraft flight operations. Local municipalities and entities have tried to come up with creative ways to limit aircraft flight operations, while stating that they do not regulate flight operations. As noted by one court, "The defendant cannot credibly

35

ORBACH HUFF & HENDERSON LLP

argue that because the ordinance limits takeoffs and landings, but not flight paths, it is not a regulation on flight operations. It is difficult, if not impossible, to draw a distinction between regulation concerning the 'flight' of aircraft and regulation concerning the takeoff and landing of aircraft." *Price v. Charter Tp. of Fenton*, 909 F.Supp 498, 503 (E.D. Mich. 1995). As stated in *City of Burbank*, "[t]he moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls." *City of Burbank*, 411 U.S. at 634.

Federal courts, in the wake of *Burbank*, have held that various attempts by local governments to enforce their police powers to control noise or otherwise affect flights are preempted. The key determinate for when an ordinance is preempted under federal law is when a noise restriction affects flights at an airport. Federal courts throughout the land have invalided local ordinances based on preemption when they affect flight at an airport. *Price v. Charter Tp. of Fenton*, 909 F.Supp 498 (E.D. Mich. 1995 (horsepower of aircraft and frequency of flights preempted); *Blue Sky Entertainment, Inc. v. Town of Gardiner*, 711 F.Supp 678 (N.D.N.Y. 1989) (decibel levels and flight paths of airplanes preempted); *United States v. City of Blue Ash*, 487 F.Supp. 135 (S.D.Ohio 1978) (noise abatement turns preempted); *Command Helicopter, Inc. v. City of Chicago*, 691 F.Supp 1148, (N.D.Ill. 1988) (lifting operations by helicopters preempted); *Gustafson v City of Lake Angelus*, 856 F.Supp. 320 (E.D.Mich. 1983) (storage, landing, and flight altitude of aircraft preempted).

The City's Touch & Go Ordinance, by regulating touch and goes and similar flight maneuvers, is a regulation that affects overflight. The City was previously warned by the FAA that its prior restrictions on aircraft operations, including its Left Turn Ban are unenforceable and preempted. AR10065-10067, AR10082-10084. Specifically, the FAA stated that:

> "[S]tate and local governments lack the authority to regulate airspace use, management and efficiency; air traffic control; and aircraft noise at its source. Federal courts have found that a navigable airspace free from inconsistent state and local restrictions is essential to the maintenance of a safe and sound air transportation system."

ORBACH HUFF & HENDERSON LLP

AR10066. In a follow-up letter the FAA stated that the Left Turn Ban was impermissible regardless of the times it is enforced. AR10084. However, the City's correspondence with the FAA was generally dismissive of the FAA's authority to regulate aircraft flight operations. AR10077-81. This dismissive view has lead to the City's assault on aircraft flying near the Airport through a series of restrictive laws that culminated in the adoption of the Touch & Go Ordinance.

E.   **The Proprietor Rights Exception Is Insufficiently Broad to Validate the Touch & Go Ordinance**

The Touch & Go Ordinance pretends to regulate noise from the Airport to hide its improper purpose to reduce noise from aircraft overflight. "The federal government regulates aircraft and airspace pervasively, preempting regulation of aircraft noise by state or local governments." *City & Cnty. of San Francisco v. F.A.A.*, 942 F.2d 1391, 1394 (9th Cir. 1991). Congress only reserved "a ***limited*** role for local airport proprietors in regulating noise levels at their airports." *Id*. Emph. added. This exception "allows municipalities to promulgate reasonable, nonarbitrary and non-discriminatory regulations of noise and other environmental concerns at the local level." *Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 88 (2d Cir. 1998), citations and quotations omitted. Further, in the years since *City of Burbank,* Congress and the FAA have limited the authority of airport proprietors to restrict aircraft operations through the adoption of ANCA and the FAA's enforcement of the AAIA grant assurances. *See Arapahoe County Pub. Airport Auth. v. FAA,* 242 F.3d 1213, 1220-21 (10th Cir. 2001) (affirming FAA decision that local ban on scheduled passenger operations violated FAA grant obligations); *City of Santa Monica v. FAA,* 631 F .3d 550 (D.C. Cir. 2011) (ban on certain aircraft to address local safety concerns violated FAA grant obligations). These demonstrate the FAA's concerted effort to limit a proprietor's power to restrict flight operations. And although the Airport does not currently have effective grant-based assurance, that does not mean the City has any greater proprietary rights. There is an express statutory prohibition on exclusive rights,

37

ORBACH HUFF & HENDERSON LLP

which also appears in the grant assurances requirements. *See* 49 U.S.C. § 40103(e). Furthermore, the FAA explicitly told the City that its proprietary powers would need to comply with ANCA. AR05806; AR05817-08; AR10066.

The City cannot restrict flight operations such as flight maneuvers and pattern flight. This is tantamount to restricting the routes of aircraft. The City does not have the unilateral authority to restrict aircraft flight operations to address noise and emissions concerns since "[t]he proprietor exception, allowing reasonable regulations to fix noise levels at and around an airport at an acceptable amount, gives no authority to local officials to assign or restrict routes." *Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 92 (2d Cir. 1998). The use of an airport operator's proprietary powers is only permitted when it is narrowly tailored. In *Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104 (9th Cir. 1981), the Ninth Circuit upheld a 100 dB single event noise exposure level ("SENEL") regulation for takeoff and landing under the municipal operator's proprietor exception. *Id*. It found that "the City's SENEL system was one of the most direct, effective and least costly methods of monitoring and regulating noise." *Id*. at 105. And that "the SENEL ordinance did not regulate airspace or flight." *Id*. The Ninth Circuit believed that the restriction was reasonable, nonarbitrary, and nondiscriminatory since it expressly regulated noise levels, was the most direct, effective, and least costly method, and applied to all aircraft based on objectively measured noise levels. However, this case was decided before Congress adopted ANCA, which likely constrains the breadth of its holding. The current extent of proprietary powers is reflected in *Nat'l Helicopter Corp. of Am.*, which was decided after ANCA. Moreover, proprietary powers never extended to regulation of routes, which is prohibited. *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 806-07 (5th Cir. 2000), citing *Nat'l Helicopter Corp. of Am.*, 137 F.3d at 91-92.

In contrast to permissible regulations, the City's Touch & Go Ordinance makes no mention of specific noise levels and flat out reduces flights within the navigable airspace. The City's intent in adopting the ordinance was to reduce noise and frequency

38

ORBACH HUFF & HENDERSON LLP

of aircraft in the traffic pattern above the Airport.[6]

The proprietor's rights exception never permitted an airport operator to restrict flight operations in a traffic pattern. The City is only permitted to adopt "reasonable, nonarbitrary and non-discriminatory regulations of noise and other environmental concerns at the local level." The Touch & Go Ordinance fails to meet this standard in all regards. It is not a reasonable restriction like the one in *Santa Monica Airport Ass'n*. It is arbitrary and discriminatory against flight schools who frequently implement the Flight Maneuvers for training purposes and is not a noise or environmental restriction—instead, it unabashedly regulates aircraft flight operations with the intended goal of reducing aircraft overflight. The Touch & Go Ordinance is not a reasonable noise restriction because it does not affix any noise levels for the operation of aircraft. The City's proprietor rights exception cannot validate the Touch & Go Ordinance and thus void and preempted.

## F.    The Savings Clause Is Not Applicable Because it Only Preserves Remedies

Although the Federal Aviation Act does contain a "savings clause", it is limited in nature. "A remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120. The savings clause is a general remedy savings clause that preserves pre-existing statutory and common law remedies. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 730-31 (9th Cir. 2016).

The inclusion of a savings clause in a statute does not limit the operation of implied or conflict preemption. *Nat'l Fed'n of the Blind*, 813 F.3d at 731-33; *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1006 (9th Cir. 2013) (state remedies survive if standard of care is preempted by federal law). Since the Touch & Go Ordinance is preempted by federal law, the savings clause would not apply. And even if it is not preempted, the savings clause would not prohibit voiding the ordinance since that clause

---

[6] *See* Section VII.B., *supra*, and VII.G., *infra*, regarding the City's improper purpose.

ORBACH HUFF & HENDERSON LLP

1  only preserves remedies, not the City's ability to adopt impermissible restrictions on

2  flight operations.

3      **G.**    <u>**The City Adopted the Touch & Go Ordinance for the Improper**</u>

4            <u>**Purpose of Limiting Aircraft Overflight**</u>

5      An ordinance adopted for an improper purpose is void. *Graber v. City of Upland*,

6  99 Cal.App.4th 424, 433-35 (Ct. App. 2002). The Court is permitted to inquire into the

7  motive and purpose of the City's adoption of the Touch & Go Ordinance because it was

8  adopted for an improper purpose. In *Stahm v. Klein*, the California Court of Appeals,

9  quoting *American Jurisprudence*, Volume 11, pages 818 to 820, stated:

10     "The rule as to the inapplicability of legislative motive or interest to
11     invalidate enactments is subject to the established exception that such
     matters may be gone into by the courts to the extent that they may be
12     disclosed on the face of acts or may be inferable from their operation.
     Both the rules and the exception are examples of the general doctrine
13     heretofore discussed that since the purpose of a statute should be
     determined from the natural and legal effect of the language employed,
14     whether it is repugnant to the Constitution must therefore be determined
     from its natural effect when put into operation, and not from its
15     proclaimed purpose.

16     "The general prohibition against inquiry as to the motives of the
     legislators applies to acts of Congress, to laws enacted by the state
17     legislatures, and to ordinances and bylaws passed by municipal
     corporations."

18 *Stahm v. Klein*, 179 Cal.App.2d 512, 520 (Ct. App. 1960) (citing numerous United

19 States Supreme Court and California Supreme Court cases in support of this exception);

20 *see also Trujillo v. City of Los Angeles*, 276 Cal.App.2d 333, 338 (Ct. App. 1969). Other

21 jurisdictions also permit the inquiry into an improper purpose of a legislative act. *See*

22 *Township of Readington v. Solberg Aviation Co.*, 409 N.J. Super. 282, 315-16 (App.

23 Div. 2009) (condemnation initiated for the improper purpose to secure Township

24 control over airport operations would not be permissible). Therefore, this Court is

25 permitted to, and should, look into the City's motivation and purpose of adopting the

26 Touch & Go Ordinance. As discussed above in detail, the voluminous public complaints

27 spurred the City to adopt the Touch & Go Ordinance to limit aircraft overflight of

28 complaining neighborhoods.

ORBACH HUFF & HENDERSON LLP

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

ORBACH HUFF & HENDERSON LLP

## H.    The City Violated an Express Covenant of the Federal Government's Deed for the Airport

The Deed to the Airport includes an express covenant that the City "shall not prevent any use of land either within or outside the boundaries of the airport…or otherwise limit its usefulness as an airport." AR00005. The City's adoption of the Touch & Go Ordinance is contrary to this express covenant. Therefore, the Touch & Go Ordinance is further ineffective since the City had no legal right under its Deed to restrict flight maneuvers.

## I.    The Touch & Go Ordinance Is Invalid, So this Court Should Issue a Writ of Mandate or Equivalent Declaratory and Injunctive Relief

As discussed above, the Touch & Go Ordinance is preempted by federal law. The City has no legal right to regulate flight operations and the City's actions were for the improper purpose of limiting aircraft in the traffic patterns for the Airport. The City cannot rely on its proprietor's rights because the Touch & Go Ordinance is unreasonable, arbitrary, discriminatory, and was not adopted to control noise levels emanating from the Airport itself. Because of this, the City has exceeded its authority.

Also, the City failed to follow the proper procedures under ANCA to regulate stage 3 aircraft under the Touch & Go Ordinance. The overwhelming evidence from the Administrative Record demonstrates that the City's motivation was to limit aircraft overflight in the North and South patterns. Therefore, this Court should issue a writ of mandate and/or declaratory judgment that the Touch & Go Ordinance is invalid and issue an injunction prohibiting the City from enforcing the Touch & Go Ordinance.

## VIII.    CONCLUSION

The City adopted the Touch & Go Ordinance to unlawfully regulate aircraft overflight. It sought to limit the frequency of flights in the traffic patterns by banning touch-and-go and stop-and-go flight maneuvers and restricting low pass and taxi-back maneuvers. Regulation of these flight maneuvers and the navigable airspace is clearly within the sole purview of the federal government and the FAA.

41

ORBACH HUFF & HENDERSON LLP

The Touch & Go Ordinance is preempted because the federal government has exclusive sovereignty over navigable airspace. This includes takeoffs and landings since they are part of the traffic pattern managed and controlled by the air traffic controller. The federal government retains the full extent of this sovereignty limited only by what Congress has expressly ceded to the states through legislation. The authority to regulate the flight maneuvers have not been ceded, so the Touch & Go Ordinance is preempted by federal law.

Further, the federal government has preempted the fields of air safety and flight operations, which encompass regulation of the flight maneuvers, which are expressly acknowledged by the FAA as legitimate maneuvers for the safe training of pilots. The Touch & Go Ordinance also conflicts with ANCA, and the City failed to comply with ANCA's requirements, so it is further preempted under conflict preemption.

Faced with numerous complaints and demands to ban or severely limit aircraft overflight, the City adopted the Touch & Go Ordinance as a means to an improper end.

Accordingly, ZAPS requests that the Court issue a writ of mandate or equivalent declaratory judgment that the Touch & Go Ordinance is invalid and issue an injunction prohibiting the City from enforcing the Touch & Go Ordinance against aircraft using the Airport.

DATED:  April 28, 2025                 ORBACH HUFF & HENDERSON LLP


By:    /s/  Stan M. Barankiewicz, II.
       Stan M. Barankiewicz II
       Christopher M. Wolcott
       Attorneys for Plaintiff/Petitioner
       ZAMPERINI AIRFIELD PRESERVATION
       SOCIETY

**CERTIFICATE OF SERVICE**

I certify that counsel of record who are deemed to have consented to electronic service are being served on April 28, 2025 with a copy of this document via the court's CM/ECF system pursuant to Local Rule 5-3.2.1.

                            /s/  Stan M. Barankiewicz, II.
                            Stan M. Barankiewicz II, Esq

ORBACH HUFF & HENDERSON LLP

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE

1

## CERTIFICATE OF COMPLIANCE

2          The undersigned, counsel of record for Plaintiff/Petitioner Zamperini Airfield

3   Preservation Society, certifies that this brief contains thirty-five pages, which

4   complies with the page limit set by court order dated January 22, 2025.

5

6   Dated: April 28, 2025          ____/s/  Stan M. Barankiewicz, II.

7                                 Stan M. Barankiewicz II, Esq

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORBACH HUFF & HENDERSON LLP

PLAINTIFF/PETITIONER'S OPENING BRIEF IN SUPPORT OF WRIT OF MANDATE