1  Mark J. Dillon (State Bar No. 108329)
2  mdillon@gdandb.com
   Lori D. Ballance (State Bar No. 133469)
3  lballance@gdandb.com
4  Yana L. Ridge (State Bar No. 306532)
   yridge@gdandb.com
5  Gatzke Dillon & Ballance LLP
6  2762 Gateway Road
   Carlsbad, California 92009
7  Telephone: (760) 431-9501
8  Facsimile:  (760) 431-9512

9  Attorneys for Defendant/Respondent,
10 City of Torrance

11 **[See Next Page for Additional Counsel]**

12                    **UNITED STATES DISTRICT COURT**

13                    **CENTRAL DISTRICT OF CALIFORNIA**

14

15
16 ZAMPERINI AIRFIELD          )    Case No. 2:24-cv-04538-CBM-JPR
   PRESERVATION SOCIETY, a     )
17 California unincorporated association, )   **RESPONDENT CITY OF**
                               )         **TORRANCE'S BRIEF IN**
18           Plaintiff/Petitioner, )      **OPPOSITION TO**
                               )         **PETITIONER'S MOTION FOR**
19                             )         **WRIT OF MANDATE**
   v.                          )
20                             )
21 CITY OF TORRANCE, a California )    Hon. Consuelo B. Marshall
   municipal corporation,      )    Petition Filed: April 22, 2024
22                             )
23           Defendants/Respondents. )    Hearing Date: October 21, 2025
                               )    Time of Hearing: 10:00 a.m.
24                             )    Place of Hearing: Department 8D
25                             )
26                             )
                               )
27 ——————————————————————————————)

28

_____
*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

Patrick Q. Sullivan (State Bar No. 179922)
psullivan@torranceca.gov
Tatia Y. Strader (State Bar No. 198735)
tstrader@torranceca.gov
Office of the City Attorney
3031 Torrance Blvd.
Torrance, California 90503
Telephone: (310) 618-5810
Facsimile:  (310) 618-5813

Attorneys for Defendant/Respondent,
City of Torrance

1

**TABLE OF CONTENTS**

2  I.    INTRODUCTION ....................................................................................1

3  II.   FACTUAL AND PROCEDURAL BACKGROUND .................................3

4      A. The City Is the Owner, Operator, and Proprietor of the Airport ..............3

5      B. The Airport Is Not Subject to Federal Assurances, Covenants,
6         or Conditions ...........................................................................................5

7      C. The City Restricted Touch and Go, Low Approach, and
          Full Stop-Taxi Back Activities at the Airport Before March 2024 ..........6

8      D. The Increase in Noise from Touch and Go, Low Approach, and
9         Full Stop-Taxi Back Actions at the Airport Prompted the City
          to Adopt Ordinance No. 3930 ...................................................................7
10

11     E. Ordinance 3930's Summary.......................................................................8

       F. ZAPS's Challenge to Ordinance 3930.....................................................10
12

13 III.  STANDARD OF REVIEW ........................................................................11

   IV.   ARGUMENT...............................................................................................12
14

15     A. Ordinance 3930 Is Not Preempted by Federal Law. ..............................12

16         (1)  Ordinance 3930 Is a Valid Exercise of the City's
                Airport Proprietor Authority...........................................................12

17         (2)  Ordinance 3930 Is Reasonable, Non-Arbitrary, and Non-
18              Discriminatory ................................................................................17

19     B. ZAPS's ANCA Violation Claim Fails.....................................................20

20         (1)  ZAPS Has No Private Right of Action to Enforce
                ANCA Violations.............................................................................20

21         (2)  Ordinance 3930 Is Not Subject to ANCA Because Its
22              Restrictions Do Not Affect Stage 2 or Stage 3 Aircraft .................21

23         (3)  An Injunction for Non-Compliance with ANCA Is Not
                Available to ZAPS ..........................................................................23

24              (a)  ZAPS Has No Standing ........................................................23

25              (b)  ANCA Is Not Applicable, and *Friends of the East Hampton*
26                   *Airport* Is Distinguishable..................................................24

27              (c)  Injunctive Relief Is Not Available to ZAPS
                     Under ANCA.........................................................................27
28

i

(d)    In Any Case, ZAPS Has Failed to Make an Evidentiary Showing to Support Issuance of a Permanent Injunction.........28

C. Ordinance 3930 Was Adopted for Legitimate Purposes ........................28

D. There Is No Obligation for the City Not to Limit the Usefulness of the Airport; and in Any Event, Ordinance 3930 Does Not Limit It ....29

E. Ordinance 3930's Saving Clause ........................................................29

V.    CONCLUSION ..........................................................................................30

PROOF OF SERVICE ..........................................................................................31

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Alaska Airlines, Inc. v. City of Long Beach,*

4
    951 F.2d 977 (9th Cir. 1991)..............................................12, 13, 25

5

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013)...................................................................23

6

7

*Arapahoe County Public Airport Authority v. F.A.A.,*
    242 F.3d 1213 (9th Cir. 2001)..............................................15, 17

8

*Ayala v. U.S. Citizenship & Immigration Services,*
    216 F.Supp.3d 1073 (E.D. Cal. 2016) .....................................11

9

10

*Bell v. City of Mountain View,*
    66 Cal.App.3d 332 (1977)........................................................11

11

12

*British Airways Bd. v. Port Auth. of N.Y. and N.J.,*
    558 F.2d 75 (2d Cir. 1977)..............................................14, 16, 25

13

*City and County of San Francisco v. FAA,*
    942 F.2d 1391 (9th Cir. 1991)..................................................14

14

15

*City of Burbank v. Lockheed Air Terminal, Inc.,*
    411 U.S. 624 (1973)...................................................12, 13, 14, 15

16

17

*City of Naples Airport Auth. v. FAA,*
    409 F.3d 431 (D.C. Cir. 2005) ...................................................4

18

*Delux Pub. Charter, LLC v. Cnty. of Orange,*
    2022 WL 3574442 (C.D. Cal. July 29, 2022) .....................20, 24

19

20

*Diaz Aviation Corp. v. Puerto Rico Ports Auth.,*
    2015 WL 6554547 (D.P.R. Oct. 29, 2015)................................20

21

*Di Perri v. Fed. Aviation Admin.,*
    671 F.2d 54 (1st Cir. 1982) ......................................................25

22

23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
    528 U.S. 167 (2000)..................................................................23

24

25

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton,*
    841 F.3d 133 (2d Cir. 2016)..........................................23, 24, 26

26

*Griggs v. Allegheny County,*
    369 U.S. 84 (1962)...................................................12, 13, 25

27

28

*Harrington v. City of Davis,*
    16 Cal.App.5th 420 (2017)........................................................12

*Horta, LLC v. City of San Jose*, 2008 WL 4067441
　　(N.D. Cal. Aug. 28, 2008)...........................................................20

*J. Arthur Properties, II, LLC v. City of San Jose*,
　　21 Cal.App.5th 480 (2018)..........................................................11

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992).....................................................................23

*National Helicopter Corp. of America v. City of New York*,
　　137 F.3d 81 (2d Cir. 1998)..............................................13, 14, 25

*Nat'l Helicopter Corp. of Am. v. City of New York*,
　　952 F. Supp. 1011 (S.D.N.Y. 1997).............................................25

*Ohio House LLC v. City of Costa Mesa*,
　　135 F.4th 645 (9th Cir. 2024)......................................................11

*Palm Beach County v. Federal Aviation Administrator*,
　　53 F.4th 1318 (11th Cir. 2022)....................................................20

*Public Lands for the People, Inc. v. U.S. Dept. of Agriculture*,
　　697 F.3d 1192 (9th Cir. 2012)......................................................11

*San Diego Public Library Foundation v. Fuentes*,
　　111 Cal.App.5th 711 (2025).........................................................11

*San Diego Unified Port Dist. v. Gianturco*,
　　651 F.2d 1306 (9th Cir. 1981).............................12, 13, 14, 25

*Santa Monica Airport Ass'n v. City of Santa Monica*,
　　481 F.Supp. 927 (C.D. Cal. 1979)..................15, 16, 18, 19, 20

*Santa Monica Airport Ass'n v. City of Santa Monica*,
　　659 F.2d 100 (9th Cir. 1981)...............................14, 15, 25

*Save Our Heritage Organization v. City of San Diego*,
　　237 Cal.App.4th 163 (2015).......................................................11

*Tutor v. City of Hailey, Idaho*, 2004 WL 344437
　　(D. Idaho Jan. 20, 2004) ............................................................20

*Western Air Lines, Inc. v. Port Auth. of N.Y. and N.J.*,
　　658 F.Supp. 952 (S.D.N.Y.1986)................................................14

*WildEarth Guardians v. Conner*,
　　920 F.3d 1245 (10th Cir. 2019)..................................................11

*Wilson v. U.S.*,
　　369 F.2d 198 (D.C. Cir. 1966) ...................................................11

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................................28

**U.S. Constitution**

U.S. Const., Art. VI, cl. 2............................................................12

**Federal Statutes**

Airline Deregulation Act of 1978, 49 U.S.C. § 41713............................13

Airport and Airway Improvement Act of 1982,
    49 U.S.C. § 47101................................................................26

Airport Noise and Capacity Act (ANCA)......................................*Passim*

49 U.S.C. § 41713...........................................................13, 25

49 U.S.C. § 47521.............................................................1, 21

49 U.S.C. § 47107...............................................................26

49 U.S.C. § 47108...............................................................26

49 U.S.C. § 47524....................................................21, 24, 26, 27

49 U.S.C. § 47526...........................................................24, 26, 27

49 U.S.C. § 47533.................................................................27

Federal Aviation Act.............................................................2

**Federal Regulations**

14 C.F.R. Part 13 and Part 16.....................................................20

14 C.F.R. Part 161..............................................................20, 24

**State Statutes**

California Environmental Quality Act .............................................10

**City of Torrance Regulations**

Ordinance 3930...........................................................*Passim*

City Municipal Code, Section 51.5.5 ...............................................9

City Municipal Code, Section 51.5.6 ...............................................9

City Municipal Code, Section 51.5.7 ...............................................9

v

# I.    INTRODUCTION

Petitioner Zamperini Airfield Preservation Society (ZAPS), an unincorporated association comprised of an unspecified number of airport users, seeks a writ of mandate to set aside the City of Torrance's Ordinance No. 3930 (Ordinance 3930), a local noise control ordinance prohibiting touch (and stop) and go practice landings, and restricting full stop-taxi back and low approach training activities at the Torrance Municipal Airport – Zamperini Field (Airport). ZAPS asserts that "one member" operates an aircraft with a Stage 3 noise rating, who "desires" to perform the ground-based activities regulated by Ordinance 3930, citing a declaration from Ivan Arnold; however, that one Stage 3 aircraft is not stored or based at the Airport.[1]

Further, ZAPS concedes it is "only challenging" Ordinance 3930, though ZAPS "colors" its brief with an array of other irrelevant airport-related regulations at the Airport over the past several years. (Opening Brief (OB) at 9.) ZAPS also concedes that the City, as the Airport owner, has "proprietor rights" allowing it to regulate noise at the Airport. (OB at 9.) ZAPS wrongly asserts, however, that Ordinance 3930 is not intended to limit airport noise, but instead, is a "veiled" effort to "limit overflights" without Federal Aviation Administration (FAA) "permission." (OB at 8-10.)

ZAPS' limited challenge to Ordinance 3930 centers on essentially two claims: (1) Ordinance 3930 is purportedly field preempted by the federal government's exclusive sovereignty over navigable airspace; and (2) even if Ordinance 3930 is not "void under field preemption," it is supposedly void under conflict preemption because it conflicts with the Airport Noise and Capacity Act (ANCA), 49 U.S.C. §§ 47521, *et seq*. (OB at 20-39.)

---

[1]  The Arnold declaration also does not state that he ever used his Stage 3 aircraft at the Airport or that he attempted to undertake practice/training takeoffs or landings and was cited by the City; and there is no evidence of any enforcement (*e.g.*, notices of violation).

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

As shown below, Ordinance 3930 is not preempted by federal law due to the albeit limited airport proprietor exception to field preemption and because the ordinance is not unreasonable, arbitrary, or unjustly discriminatory. Further, ZAPS's conflict with ANCA claim fails because ANCA has no private right of action available to ZAPS or other third parties, and ANCA is not applicable to airports with no Stage 2 or Stage 3 aircraft. (*See* Declaration of Airport Manager Rafael Herrera [Herrera Dec.] at ¶ 11.) ZAPS has also not established standing under ANCA, nor satisfied the evidentiary standards required for the issuance of an injunction.

ZAPS includes other ancillary arguments, namely: (a) the Ordinance was adopted to limit overflights and not as a ground-based regulation to control noise concerns (OB at 40); and (b) the Ordinance somehow violates the deed to the Airport and associated "covenant" not to limit the site's "usefulness as an airport" (OB at 41).[2]

To the contrary, as shown below, the City adopted Ordinance 3930 as a noise control ordinance rationally related to the legitimate interest of *minimizing* noise in the neighboring communities surrounding much of the Airport. Specifically, Ordinance 3930 restricts full stop-taxi back and low approach ground-based actions at the Airport during set days and times. Ordinance 3930 also upholds a prohibition on touch-and-go and stop-and-go practice landings by non-stage aircraft. It does so because these non-stage aircraft are among the noisier aircraft based at the Airport. While there is value in practice and training, those values do not override the fact that, based on the record, Ordinance 3930 is rationally related to the legitimate local interest of addressing noise concerns by reducing these practice takeoffs and landings

---

[2]  ZAPS also asserts that the "savings clause" in the Federal Aviation Act is not applicable to save Ordinance 3930.  However, the City is not making this argument, so this portion of the opening brief can be dismissed as superfluous. Nonetheless, Ordinance 3930, Section 3, contains its own savings clause that may be applicable should this Court declare any section invalid or unconstitutional (though it should not do so).

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

while still allowing student pilots and others to make takeoffs and landings to a full stop.

Also contrary to ZAPS's claim, Ordinance 3930 does not limit the usefulness of the Airport — though the City is not obligated to "maintain its usefulness."

Notably, the FAA has not written the City, stating that Ordinance 3930 is preempted or in conflict with ANCA; the FAA has not attempted to intervene in this case; and the FAA has not sought to file an *amicus curiae* brief in this action. Similarly, none of the airport-based flight schools has filed suit challenging Ordinance 3930; and no flight school has sought to intervene, or to file an *amicus curiae* brief in this case.

Based on the record of proceedings, the requests for judicial notice, and declarations submitted as part of the parties' briefing, ZAPS's writ request should be denied in its entirety because Ordinance 3930 is a valid exercise of the City's airport proprietor authority, it is not in conflict with ANCA, ANCA does not apply, and in any case, ZAPS has failed to satisfy its standing and injunction evidentiary requirements under ANCA.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The City Is the Owner, Operator, and Proprietor of the Airport.

Owned and operated by the City of Torrance (airport proprietor), the Airport serves as a general aviation airport with approximately 543 based aircraft. (Herrera Dec. ¶ 5.) The Airport is located approximately nine miles south of Los Angeles International Airport. (AR: 9132.) There are three other airports within 6 to 16 miles from the City – Long Beach Airport, Hawthorne Municipal Airport, and Compton/Woodley Airport. (Herrera Dec. ¶ 8.)

The Airport is comprised of two parallel runways numbered 11L/29R and 11R/29L. (AR: 9134.) Runway 11L/29R is referred to as the north runway and 11R/29L is referred to as the south runway. The north runway is approximately

5,000-feet long and 150-feet wide, and it the primary runway for aircraft operations. The south runway, by comparison, is only approximately 3,000-feet long and 75 feet wide. (*Id.*) Though operations have been historically lower on this runway, operations have increased somewhat due to its location in relation to some of the flight schools and delays on the north runway. (*Id.*) These two runways can handle a maximum aircraft weight of 20,000 pounds per wheel; however, the combination of length and weight capacity makes the runways near ideal for general aviation but are not recommended for air carrier type aircraft. (AR: 10050.)

For background, a general aviation airport, like Zamperini Field, is generally a public-use airport that does not have commercial air carrier service; and its operations include personal, business, and commuter flying; charter flights; flight training; helicopters; and other propeller driven small airplanes that do not have a stage classification under the FAA noise regulations. (Herrera Dec. ¶ 6.) Flight schools based at the Airport include Sling Pilot Academy (Sling), the largest of the six onsite flight schools.  (Herrera Dec. ¶ 9.)

Importantly, there are no Stage 2 aircraft or Stage 3 aircraft based at the Airport. (Herrera Dec. ¶ 11.) The aircraft operating at the Airport are non-stage aircraft – that is, small single-engine propeller-driven aircraft. (Herrera Dec. ¶¶ 6, 11.)  Airplanes are certificated to be in compliance with FAA noise standards as part of the airplane certification process, under which manufacturers must demonstrate that an airplane complies with all applicable airworthiness, noise, and other standards. *See* Request for Judicial Notice (RJN) Ex. A at 15; *see also City of Naples Airport Auth. v. FAA*, 409 F.3d 431, 433 (D.C. Cir. 2005).

FAA classifies civil jet aircraft in one of five stages, with Stage 1 as the loudest and Stage 5 the quietest. (RJN Ex. A at 15.) Stage 1 airplanes have been prohibited from operating in the United States since 1985, and Stage 2 aircraft, including smaller business jets, have not been permitted in U.S. airspace since the end of 2015. (*Id.*) All

civil aircraft must be certificated at Stage 3 or higher. (*Id.*) Most jets in operation today are Stage 3, 4, or 5 aircraft with much quieter engines, and since December 31, 2020, all new airplane types submitted for FAA certification must meet Stage 5 noise requirements. (*Id.*)

The City maintains a Noise Abatement Office to reduce aircraft noise and improve the Airport's compatibility with the surrounding community. (Herrera Dec. ¶ 20.) The City continuously seeks ways to enable pilots to use the airport while minimizing noise complaints and concerns within the surrounding community. (AR: 9123-9124 [the City commissioned a noise study in 2023 and considered expanding the existing noise monitoring system], 9143 [27,245 aircraft noise complaints were submitted to the City in 2023].) While the City's Noise Abatement program has been reducing the aircraft noise for the benefit of the City's residents, the noise concerns are still ongoing. (Herrera Dec. ¶ 21; *see also e.g.* AR: 6186, 7688, 7694, 7857, 8943.) Types of aircraft that cannot meet the stringent noise standards are banned at the airport. (Herrera Dec. ¶ 11.)

### B.    The Airport Is Not Subject to Federal Assurances, Covenants, or Conditions.

In 1943, the airport site was acquired by the United States, U.S. Army Corps of Engineers, and in 1948, the United States executed a Quitclaim Deed granting approximately 385 acres to the City. (AR: 1-8, 10043, 10057.) At that time, the United States retained rights to the then one runway, along with restrictions and conditions, including a condition stating, "That all of the property . . . shall be used for public airport purposes, and only for such purposes, on reasonable terms and without unjust discrimination." (AR: 1-8, 399-400.)

In 1956, the United States delivered another Quitclaim Deed granting the City almost complete and clear title to the airport property, which became known as the Torrance Municipal Airport. (AR: 9-14.) This conveyance to the City was in fee

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

simple without any conditions or restrictions (except for a license to explore and excavate fissionable materials). (AR: 9-14, 398-440.)

Further, the FAA acknowledges that the City is not obligated under any FAA grant assurances, deed covenants, or deed conditions regarding the City's operation of the airport. (*See* AR: 10057, 10059, 10060.) The City maintains the airport "such that safety is not jeopardized." (AR: 10062.) The FAA opined that provided that the City maintains the property as an airport, it will be in compliance with "any FAA sponsor assurance, grant obligation, or deed covenant." (AR: 10063.)[3] The City currently uses the site for public-use airport purposes (AR: 10049-50), and Ordinance 3930 does not eliminate such use.

### C. The City Restricted Touch and Go, Low Approach, and Full Stop-Taxi Back Activities at the Airport Before March 2024.

For almost 25 years before March 7, 2024, the effective date of Ordinance 3930, the City's Municipal Code provisions prohibited: (a) the touch (and stop) and go landings and low approach operations between the hours of 8:00 p.m. and 8:00 a.m., Monday through Friday; 8:00 p.m., Friday and 10:00 a.m., Saturday; and 5:00 p.m., Saturday and 8:00 a.m., Monday; (b) full stop-taxi back 10:00 p.m. to 8:00 a.m., Monday through Friday; 8:00 p.m., Friday and 10:00 a.m., Saturday; and 5:00 p.m., Saturday and 8:00 a.m., Monday; and (c) and all such activities on certain holidays. (AR: 8927-28, 9016-9017.) As a result, the City's exercise of its authority to regulate ground-based activities to control noise at the Airport is not new.

---

[3] The City disputes the FAA's claim that it is obligated to maintain the property as an airport (AR: 398-401); however, this claim is beyond the scope of the issues presented in this case.

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

### D. The Increase in Noise from Touch and Go, Low Approach, and Full Stop-Taxi Back Actions at the Airport Prompted the City to Adopt Ordinance No. 3930.

In the past several years, the noise has increased from touch and go, stop and go, full stop-taxi back, and low approach ground-based activities performed primarily by Torrance-based flight school aircraft. The increase in noise has resulted in noise complaints from residents in the densely populated residential neighborhoods surrounding the Airport. (*See* AR: 9143 [and Fig. 13]; 9184 [Map]; AR: 7685 [staff report]; and public comments about resident experiences at *e.g.*, AR: 6186, 7688, 7694, 7857, 8943.) Such activities, performed mostly for training purposes, also present safety and quality of life concerns for the City's residents. (*E.g.*, AR: 4301, 4399, 6240, 6268, 07199, 07200, 07203, 07213 [lines 19-25].)

On October 17, 2023, prompted by resident reports about noise from training operations by single-engine propeller-driven aircraft from Torrance-based flight schools, City Council discussed touch and go activities at the Airport and requested that the item be brought back to it for further consideration. (AR: 7677, 8927; see also AR: 7824 ["Today was another dangerous day of low and noisy student pilot practice flights over Torrance homes, over and over and over!"]; 7836 ["The flight schools, their students and others … have continually flown their loud engines at low altitudes …"]; 7853 ["Sling [has] the most planes in the air, they occupy the north runway most of the time …"]; 7855-56 ["Airplane after airplane, roaring over my house …"]; 7857 ["The recent increase in airport activity is directly related to the touch and goes …"]; 7861 ["We now live in the city that houses the largest flight school in Southern California with over 30 planes and hundreds of students all who do touch and goes … The touch and go training flights mean low-flying student pilots repeatedly circling over Torrance neighborhoods and schools."].)

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

On January 23, 2024, after hearing public comments about the increase in noise from small but noisy aircraft in training and discussing the matter thoroughly, City Council voted 5-1 to adopt Ordinance 3930, amending the City's already existing restrictions on touch and go activities. (AR: 8967, 9203, 9032.) On February 6, 2024, the City Council held the second and final reading of Ordinance 3930, which went into effect on March 7, 2024. (AR: 9203, 9213-15.) Ordinance No. 3930 prohibits touch (and stop) and go activities at the airport and restricts full stop-taxi back and low approach to 10:00 a.m. to 6:00 p.m., Monday through Friday only.  (AR: 9213-15.)

Throughout the amendment process, the City communicated and coordinated with the FAA regarding the amended restrictions. (AR: 6931.) The FAA has not brought any action seeking to overturn Ordinance 3930, either through its own enforcement process or in the courts. Flight schools continue to operate at the Airport, and no school filed suit or attempted to join in this suit.

**E.    Ordinance 3930's Summary.**

The City's adopted Ordinance 3930 has been incorporated into Article 5 of the Torrance Municipal Code. (AR: 9213-9215, 9271-9272.) Ordinance 3930 first defines the regulated activities at the Airport:

- "**Touch and go**" means an action whereby an aircraft makes a landing and departure on a runway without stopping or exiting the runway.  (AR: 9271.)

- "**Stop and go**" means an action whereby an aircraft makes a landing, followed by a complete stop on the runway and a takeoff from that point.  (*Id*.)

- "**Full Stop-Taxi Back**" means an action whereby an aircraft lands on the runway, followed by exiting the runway, with or

without a complete stop, and returning directly to the approach end of the runway for a subsequent take-off. (*Id*.)

- "**Low Approach**" means an action whereby an aircraft makes a landing approach over the Airport but where the pilot intentionally does not contact the runway. (*Id*.)

Section 51.5.5 provides that touch (and stop) and go actions are not permitted at the Airport. (AR: 9271.) However, nothing in Ordinance 3930 prohibits a pilot from making takeoffs and landings to a full stop as a training tool. It only prohibits touch (and stop) and goes as a means of reducing noise in neighboring residential communities. Such actions are a source of the noise concerns identified by the City and the community. (*E.g.* AR: 7857, 7861.)

The City's Municipal Code, Sections 51.5.6 and 51.5.7, restrict low approach and full stop-taxi back activities at the Airport, to take place between 10:00 a.m. and 6:00 p.m., Monday through Friday; and such activities are prohibited on weekends and City observed holidays. (AR: 9272.) In other words, the airport remains available for pilots to train using standard taxi-back procedures weekdays from 10:00 a.m. through 6:00 p.m.

Ordinance 3930, Section 2, is an "inconsistency" provision (not triggered in this case), and Section 3 is the Ordinance's savings clause. (AR: 9214.)

Section 3 provides that, "If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason deemed or held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, such decision will not affect the validity of the remaining portions of this ordinance." (*Id*.) Notably, this savings clause is not limited to remedies; it applies if any part of Ordinance 3930 is deemed invalid or unconstitutional. In that event, such a decision "will not affect the validity of the remaining portions" of Ordinance 3930. (*Id*.)

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

Section 4 addresses the Ordinance's compliance with the California Environmental Quality Act (CEQA), which is not at issue in this case; and Section 5 states that Ordinance 3930 took effect 30 days after the date of its adoption to allow for referenda, also inapplicable in this case. (AR: 9214.) Ordinance 3930 was adopted February 6, 2024. (*Id*.)

In sum, Ordinance 3930 is narrowly tailored to local ground-based activities only (operations that begin and end at the Airport). It targets one type of training tool, namely, touch (and stop) and goes; the Airport remains available for pilots to train using standard taxi-back procedures weekdays from 10:00 a.m. to 6:00 p.m. Pilots can also continue to train by making takeoffs and landings to a full stop. It only prohibits performing touch (and stop) and goes to address neighboring noise concerns.

**F.    ZAPS's Challenge to Ordinance 3930.**

On April 22, 2024, Petitioner ZAPS filed a petition against the City seeking writs of administrative mandamus, traditional mandate, and other extraordinary relief (petition) in the Los Angeles County Superior Court (Case No. 24STCP01278). The petition challenges the validity of the City's Ordinance 3930, an ordinance adopted by the City Council amending its Municipal Code to prohibit touch (and stop) and goes and restrict full stop-taxi back and low approaches at the Airport, from 10:00 a.m. to 6:00 p.m., Monday through Friday.

On May 31, 2024, the City removed this action to the United States District Court, Central District of California, on the grounds that it alleges the City's adoption and implementation of Ordinance 3930 on federal preemption grounds. Since the case was removed, the City prepared and certified the record of proceedings related to the City's adoption of Ordinance 3930.  (*See* ECF No. 22.)

## III.   STANDARD OF REVIEW

"Judicial review is limited to determining whether the local agency's action 'was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law.' … An agency's decision will be upheld if it properly considered all pertinent factors and establishes a reasonable connection between those factors, its decision, and the intent of the enabling statute." *San Diego Public Library Foundation v. Fuentes*, 111 Cal.App.5th 711 (2025).

Public agencies are presumed to act in accordance with the law. *Ayala v. U.S. Citizenship & Immigration Services*, 216 F.Supp.3d 1073, 1076 (E.D. Cal. 2016); *see also WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019); *Bell v. City of Mountain View*, 66 Cal.App.3d 332, 341 (1977). The presumption can be overcome only by clear evidence showing that the agency's actions were arbitrary or based on a misinterpretation of statutory law, or violated prescribed procedures. *Ayala*, 216 F.Supp.3d at 1076; *see also Wilson v. U.S.*, 369 F.2d 198, 200 (D.C. Cir. 1966).

Courts generally "afford significant weight to a government's narrowing interpretation of its own laws." *Ohio House LLC v. City of Costa Mesa*, 135 F.4th 645, 665 (9th Cir. 2024); *Public Lands for the People, Inc. v. U.S. Dept. of Agriculture*, 697 F.3d 1192, 1199 (9th Cir. 2012) (giving wide deference to administrative agencies' reasonable interpretations of their own regulations).

The City's interpretation of its ordinances and determinations regarding compliance with its regulations are entitled to deference. *See Save Our Heritage Organization v. City of San Diego*, 237 Cal.App.4th 163, 173 (2015) (the City's findings of compliance with the Code are given substantial deference and are presumed correct); *J. Arthur Properties, II, LLC v. City of San Jose*, 21 Cal.App.5th 480, 486 (2018) (deferring to the agency's interpretation of its Municipal Code because the agency is "intimately familiar with regulations it authored and sensitive

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

to the practical implications of one interpretation over another"); *Harrington v. City of Davis*, 16 Cal.App.5th 420 (2017) (upholding the city's grant of a use permit based on the city's analysis of the project and construction of its Municipal and Building Codes, which is entitled to "significant deference").

## IV.    ARGUMENT

### A.    Ordinance 3930 Is Not Preempted by Federal Law.

#### (1)    Ordinance 3930 Is a Valid Exercise of the City's Airport Proprietor Authority.

Contrary to Petitioner ZAPS' claim regarding the federal government's exclusive authority and field preemption, the government's authority over airports and airspace matters is not absolute.

The Supremacy clause, U.S. Const., Art. VI, cl. 2, invalidates any exercise of state or local power that frustrates the objectives of legitimate national policy. Congressional purpose or intent can be express or implied. *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1310-1311 (9th Cir. 1981). And long ago, the Supreme Court held "that the pervasive scope of federal regulation of the airways implied a congressional intention to preempt municipal aircraft noise restrictions based upon the police power." *See Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 982 (9th Cir. 1991), citing *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638-640 (1973).

However, the Ninth Circuit in *Alaska Airlines* made clear that the Supreme Court "left the door open to noise regulations imposed by municipalities acting as airport proprietors, . . . based on such municipalities' legitimate interest in avoiding liability for excessive noise generated by the airports they own." 951 F.2d at 982, citing *City of Burbank*, 411 U.S. at 635-636, n.14. Further, the rationale for the airport proprietor exemption is critically important: "Since airport proprietors bear monetary liability for excessive aircraft noise under *Griggs v. Allegheny County*, 369 U.S. 84 (1962), . . . fairness dictates that they must also have power to insulate

themselves form that liability." *Gianturco*, 65 F.2d at 1316-1317. Thus, the *Griggs* liability is the fundamental basis supporting the need for the airport proprietor exemption. (*Id*.)

And in *Gianturco*, the Ninth Circuit cited the 1976 Aviation Noise Abatement Policy, which further explained the basic tenets of the airport proprietor exemption:

> "The airport proprietor is closest to the noise problem, with the best understanding of both local conditions, needs and desires, and the requirements of the air carriers and others that use his airport. The proprietor must weigh the costs the airport and the community must pay for failure to act, and consider those costs against any economic penalties that may result from a decision to limit the use of the airport through curfews or other restrictions for noise abatement purposes."

651 F.2d at 1317, n.27.

After the *City of Burbank*, Congress enacted the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b), which provided express preemption and codified the airport proprietor exemption for air carrier airports. The Act does abrogate the airport proprietor exemption developed in the *City of Burbank* and other aviation case law. First, Congress granted express preemption over a state or other authority enacting or enforcing a law or regulation over a "price, route, and service of an air carrier." *See* 49 U.S.C. § 41713(b)(1). Second, the Act codified the airport proprietor exemption, stating that, "[t]his subsection does not limit a State [or other political subdivision] that owns and operates *an airport served an air carrier* . . . from carrying out its proprietary powers and rights." *Id*. at § 41713(b)(3) (emphasis added); *see also Alaska Airlines*, 951 F.2d at 982. Accordingly, the Supreme Court and federal courts have already resolved the field preemption issue and have recognized that local restrictions for noise and safety are legal under the airport proprietor exemption to field preemption. *E.g., National Helicopter Corp. of America v. City of New York*, 137 F.3d 81, 89 (2d Cir. 1998) (holding that weekday and weekend curfews to protect "the local residential community from undesirable heliport noise during sleeping

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

hours is primarily a matter of local concern and for that reason falls within the proprietor exception"). Indeed, in *National Helicopter Corp. of America*, the court generally recognized federal preemption over the regulation of aircraft and airspace but made clear that such preemption is subject to "a complementary though more limited role for local airport proprietors in regulating noise levels at their airports." 137 F.3d at 88, citing *City and County of San Francisco v. FAA*, 942 F.2d 1391, 1394-1395 (9th Cir. 1991).

The court in *National Helicopter* added that "the proprietor exception allows municipalities to promulgate 'reasonable, nonarbitrary, and non-discriminatory' regulations of noise and other environmental concerns at the local level." 137 F.3d at 88-89, citing *British Airways Bd. v. Port Auth. of N.Y. and N.J.*, 558 F.2d 75, 84 (2d Cir. 1977) (regulations of noise levels); and *Western Air Lines, Inc. v. Port Auth. of N.Y. and N.J.*, 658 F.Supp. 952, 957 (S.D.N.Y.1986) (permissible regulations of noise and other environmental concerns), *aff'd,* 817 F.2d 222 (2d Cir. 1987).

In this case, ZAPS does not dispute the existence or viability of the airport proprietor exemption. It argues instead that it is a "limited" exemption. (OB at 31.) Each case, however, requires the courts to "assess the effect of the state regulation on national aviation and aircraft noise policy." *Gianturco*, 65 F.2d at 1311.

Here, the regulation at issue is a local ordinance (Ordinance 3930) prohibiting touch (and stop) and go practice takeoffs and landings and restricting low approach and full stop taxi-back procedures at a general aviation airport, enacted by the City under its airport proprietor authority. And ever since *City of Burbank*, 411 U.S. at 635-636, n.14, *Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 103-04 (9th Cir. 1981), and *Gianturco*, 651 F.2d at 1316-1319, courts have recognized that Congress has "singled out airport proprietors and gave them special, although undefined, leeway in controlling sources of aircraft noise directly."

Though the airport proprietor exemption is limited, Ordinance 3930 falls squarely within the City's airport proprietor's authority. *See Santa Monica*, 659 F.2d at 104-05; and *Santa Monica Airport Ass'n v. City of Santa Monica*, 481 F.Supp. 927 (C.D. Cal. 1979). In the *Santa Monica* cases, the courts upheld the local airport proprietor's ordinances, including restricting low aircraft approach training, and prohibiting helicopter flight training, on the grounds that such restrictions were within the airport proprietor's authority to regulate noise made by aircraft, and were not preempted. *E.g.*, 659 F.2d at 102, 104-105.

Now, ZAPS asserts that since *City of Burbank*, Congress has limited the airport proprietor exemption through the enactment of ANCA and the FAA's enforcement of grant assurances. (OB at 37.) But this is of no moment because: (a) the City acknowledges the proprietor exemption is indeed limited, but it remains a viable tool for local airport proprietors to reasonably regulate noise in a non-discriminatory way, which is exactly what occurred with the adoption and implementation of Ordinance 3930; and (b) the City's Airport is not subject to any FAA grant assurances or conditions (AR: 9-14, 398-440); and ZAPS has not proven otherwise.

Additionally, federal courts have consistently held that airport proprietors can regulate certain activities to advance local interests provided such regulations are reasonable, non-arbitrary, and non-discriminatory. *Arapahoe County Public Airport Authority v. F.A.A.*, 242 F.3d 1213, 1223 (9th Cir. 2001); *see also Santa Monica*, 481 F.Supp. at 932 ("With respect to the ordinance sections dealing with control of noise at the airport, preemption was denied on the ground that a municipal airport proprietor may exercise control over airport noise providing such control is exercised reasonably, non-discriminatorily, and *without pointing a "dagger . . . at the heart of commerce*." [emphasis added]).

The FAA agrees that the airport proprietor has authority to promulgate reasonable, nonarbitrary, and non-discriminatory regulations addressing aircraft noise and appropriate local interests. (AR: 10066.) FAA Order 5190.6B explains:

> "Airport sponsors are primarily responsible for planning and implementing action designed to reduce the effect of noise on residents of the surrounding area. Such actions include optimal site location, improvements in airport design, *noise abatement ground procedures*, land acquisition, and *restrictions on airport use* that do not unjustly discriminate against any user, impede the federal interest in safety and management of the air navigation system, or unreasonably interfere with interstate or foreign commerce."

(AR: 7363 [emphasis added].)

Protecting residents from aircraft noise has been recognized as a matter of local interest for airport proprietors. *Santa Monica*, 481 F.Supp. at 938-939 (finding that "the interest being protected, protecting the sleep of the surrounding residential community from the noise of aircraft operations at night, is a matter of peculiar local concern"); *see also British Airways Bd. v. Port Authority of New York*, 558 F.2d 75, 83 (2nd Cir. 1977) ("It is perhaps more important, however, that the inherently local aspect of noise control can be most effectively left to the operator, as the unitary local authority who controls airport access.").

In this case, the resident noise and safety concerns with touch (and stop) and go, full stop-taxi back, and low approach activities at the Airport are numerous and well-documented. (*See e.g.,* AR: 6187 ["cannot hold a conversation within our homes or watch TV"], 6189 ["noise from aircraft … has become intolerable"], 6240 ["constant roar of small aircraft at low altitudes above me"], 6337 ["past couple of years … a huge increase in planes … flying way too close to homes in the area"], 6364 ["noise … intolerable" and "cannot even hold a conversation in our backyard while a plane is flying over"], 6396 ["negative impact on our health and wellbeing" and "significant disruptions to our dinner and family time"], 6436 ["excessive, disturbing noise"], 6437 ["my windows shake and my home vibrates … feels as if I

16

am being bombarded as if I am in a war zone"], 6611 [discussing negative health impacts from excessive and constant aviation noise], 6613 ["cannot hear a basic conversation" due to aircraft noise], 6620 ["overwhelming barrage of noise disturbing our previously peaceful neighborhood" and "the quality of life … has been completely decimated by the incessant flights"], 7851 [potential crashes, hazardous], 7853 [recent crash on a kids' soccer field], 7860 [noise pollution and aviation accidents], 8942 [greatest risk for accidents]; 9018-9019 [safety concerns].)

Such concerns support the City's actions as the airport proprietor, to restrict specified ground-based activities to reduce noise and improve the safety and quality of life for residents living near the Airport – a uniquely local concern in the City of Torrance.

Undaunted, ZAPS asserts Ordinance 3930 is "not a noise or environmental restriction" but instead the regulation of "aircraft overflight." (OB at 39.) This is wrong. Ordinance 3930 regulates and reduces noise made by aircraft and only as to certain training activities generating the most noise at the Airport. The voluminous number of resident noise complaints prompted the adoption of Ordinance 3930. (*E.g.,* AR: 6436, 6613, 7857, 8943.) That it may reduce flights over the neighboring community does not vitiate the ground-based noise reduction benefits of Ordinance 3930. Thus, Ordinance 3930 is not field preempted under federal law.

### (2)    Ordinance 3930 Is Reasonable, Non-Arbitrary, and Non-Discriminatory.

As shown above, the airport proprietor exemption to federal preemption applies to Ordinance 3930, which should be upheld because the City, as the airport proprietor, has the authority to address noise concerns in the neighboring community in a way that is reasonable, non-arbitrary, and non-discriminatory. *See Arapahoe County Public Airport Authority*, 242 F.3d at 1223.

Ordinance 3930 is reasonable considering the City's legitimate attempt to address the local public concerns over aircraft noise that has increased in recent years due to small single-engine propeller-driven aircraft from Torrance-based flight schools conducting training operations. (*See e.g.,* AR: 7865 ["flights every 30 to 60 to 90 seconds all day long"]; 7867 ["Regular flight and small flight schools have operated around here for years without a problem, and then a large flight school moved into the area with dozens of planes and inundated the skies with lots of noisy training flights causing a major nuisance for thousands of residents."]; 9027 ["Sling's repetitive training and touch and go training flights hover over our neighborhoods over 30, 40, 50 times an hour .... [we are] in their warpath …"].)

The provisions of Ordinance 3930 are not arbitrary because they focus on reducing noise, a local community concern; specifically, the increase in local flight training resulting in noise increases over the neighboring residential community. Ordinance 3930 also does not exclude any particular pilot, flight school, or type of aircraft. It does not prohibit or restrict all flights and operations, whether training or not, and only governs the activities that cause the most noise and potential aviation accidents to the residential community, namely, touch (and stop) and go training runs, low approach, and full stop-taxi back activities, performed mostly by small non-stage aircraft. Since adoption of Ordinance 3930, no Torrance-based flight school has closed or moved, and Sling, the largest flight school, continues to operate at the Airport. (Herrera Dec. ¶¶ 9, 22.)

Further, Ordinance 3930 does not burden interstate commerce of the national airport system; and at best, any such burden is incidental. *See Santa Monica*, 481 F.Supp. at 936 ("Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.")

**First**, the Airport is a general aviation facility and not a major international and domestic hub for commercial air carrier flights, and Ordinance No. 3930 targets only the activities at the Airport that impact the local community. Thus, restricting such local action will not undermine "a fair and efficient system of air commerce" and will not "inhibit the accomplishment of legitimate national goals." *See Santa Monica*, 481 F.Supp. at 936-937.

**Second**, Ordinance 3930 does not prohibit all training activities at the Airport but only those that are the highest producers of noise to the surrounding residential neighborhoods. Pilots can still make takeoffs and landings to a full stop. The Airport remains available for pilots to train using standard taxi-back procedures. Under Ordinance 3930, pilots are restricted from conducting low approach and full stop-taxi back activities at the Airport in the evening, nighttime, and early morning. (AR: 9271-9272.) However, pilots can still conduct such activities at the Airport for approximately 8 hours per day, Monday through Friday (from 10:00 a.m. to 6:00 p.m.). (*Id.*)

Lastly, Ordinance 3930 is not unjustly discriminatory. It applies to specific training activities at the Airport that generate the greatest number of noise-related complaints from the neighboring community. It does not "discriminate" against any individual user. Nonetheless, ZAPS concludes that Ordinance 3930 discriminates against "flight schools" (OB at 39) but presents no evidence to support its bare conclusion; and in any case, no flight school has filed suit or sought to join this suit alleging "unjust discrimination." Further, ZAPS has no standing to assert the rights of non-parties, such as flight schools operating at the Airport.

And, as an important aside, three other airports located near the City are available to pilots to perform the activities restricted by Ordinance 3930. (*See* Herrera Dec. ¶ 8.) Pilots seeking to conduct these restricted training activities have options in the region, including nearby Long Beach Airport. And even if a few training

19

activities were to relocate from Torrance Municipal Airport to other nearby airports, such relocation would not point "a dagger at the heart of commerce" within the national air transportation system. *Santa Monica*, 481 F.Supp. at 932.

Lastly, ZAPS pays lip service to the claim that Ordinance No. 3930 is unreasonable, arbitrary, discriminatory, and an undue burden to interstate commerce, but presents no cogent argument, law, or record evidence as support for such claims. For this reason alone, this Court can and should reject such claims.

### B.    ZAPS's ANCA Violation Claim Fails.

### (1)    ZAPS Has No Private Right of Action to Enforce ANCA Violations.

Airport sponsor compliance with ANCA is enforced through limited FAA mechanisms,[4] but a private right of action is not one of them. Courts unanimously find that ANCA does not provide a private right of action. *Horta, LLC v. City of San Jose*, 2008 WL 4067441, at *4 (N.D. Cal. Aug. 28, 2008) ("Congress did not intend to create a private right of action for ANCA violations" because "ANCA contains its own enforcement mechanism to be administered by the Secretary of Transportation"); *Tutor v. City of Hailey, Idaho*, 2004 WL 344437, at *8 (D. Idaho Jan. 20, 2004) ("[N]o implied private right of action exists under ANCA."); *Delux Pub. Charter, LLC v. Cnty. of Orange*, 2022 WL 3574442, at *11 (C.D. Cal. July 29, 2022) ("It is undisputed that ANCA [] and the Grant Assurances do not supply a private right of action."); *Diaz Aviation Corp. v. Puerto Rico Ports Auth.*, 2015 WL 6554547, at *2 n.1 (D.P.R. Oct. 29, 2015) (collecting cases concluding that ANCA does not provide a private right of action).

---

[4]  The FAA enforces ANCA compliance through 14 C.F.R. Part 161 proceedings and by using both informal and formal complaint processes under 14 C.F.R. Part 13 and Part 16. *See Palm Beach County v. Federal Aviation Administrator*, 53 F.4th 1318 (11th Cir. 2022). ***The FAA has not commenced an enforcement proceeding against the City for alleged non-compliance with ANCA***.

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

ZAPS does not appear to dispute that ANCA provides no private right of action. (OB at 17.) As a result, ZAPS's ANCA preemption claim (OB at 31) fails to state any colorable claim in this case.

### (2) Ordinance 3930 Is Not Subject to ANCA Because Its Restrictions Do Not Affect Stage 2 or Stage 3 Aircraft.

Additionally, ANCA was enacted in 1990 to address the "noise concerns [that] led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system" and to establish and carry out "a noise policy … at the national level." 49 U.S.C. § 47521(2)-(3). To accomplish this goal, ANCA includes requirements for public notice, comment, analyses, and FAA approval of proposed restrictions *for the operation of Stage 2 and Stage 3 aircraft*. 49 U.S.C. § 47524. As explained in Congressional Research Service Report, Federal Airport Noise Regulations and Programs, dated September 27, 2021, the separate noise levels or "stages," each with specific limits, have been introduced by the FAA in 1977, with Stage 1 being the loudest and Stage 5 the quietest. (RJN Ex. A p. 2.) The noisiest Stage 1 and Stage 2 aircraft, certified prior to 1977, have been phased out. (*Id.*) "All Stage 2 aircraft, including smaller business jets, have been barred from U.S. airspace since the end of 2015, except those with special permission. Most jets in operation today are Stage 3, Stage 4, and Stage 5 aircraft with much quieter engines." (*Id.*)

"The Stage 3 standards for takeoff, landing and sideline measurements range from 89 to 106 decibels, depending on an airplane's weight and number of engines. Meeting the more stringent Stage 4 standards requires a cumulative decrease of 10 decibels from the Stage 3 standard. Stage 5 requires a further cumulative decrease of 7 decibels from the Stage 4 requirement." (*Id.*)

ANCA does not apply to non-stage aircraft. As the FAA explains, propeller driven, commuter, and general aviation aircraft are non-stage aircraft. "Aircraft certificated under Part 36 Subpart F, Propeller Driven Small Airplanes and Propeller-

21

Driven, Commuter Category Airplanes, do not have a stage classification, and as such are referred to as non-stage. The vast majority of small general aviation aircraft and propeller-driven commuter aircraft flying in the United States are non-stage aircraft." (AR: 7365 [FAA Order 5190.6B].) Indeed, the FAA has made clear that "ANCA does not apply to restrictions on operations by propeller driven aircraft weighing 12,500 pounds or less because none of these aircraft are classified as stage 2 or 3, and ANCA governs restrictions on operations by stage 2 and 3 aircraft." (*See* Herrera Dec. ¶¶ 12-13, Ex. 2, at 1].) ZAPS also does not dispute that ANCA prohibitions apply only to airport noise and access restrictions as to Stage 2 and Stage 3 aircraft. (*See* OB at 32.)

Here, the Airport serves as a general aviation airport with six flight schools that provide over 40 small aircraft for training purposes. (Herrera Dec. ¶ 9.) No Stage 2 aircraft and no Stage 3 aircraft are based at the Airport.  (*Id.* at ¶ 11.) The aircraft based and operating at the Airport are small single-engine propeller-driven aircraft. (*Id.* at ¶¶ 6-7, 11-12.)  The noise from such aircraft—non-stage aircraft—is the reason the City took action and adopted Ordinance 3930. (*Id.* at ¶¶ 6, 11, 21.) Further, Stage 3 aircraft are not known to conduct touch (and stop) and go, low approach, and full stop-taxi back activities at the Airport. (*Id.* at ¶ 11.) Therefore, in practice, the restrictions under Ordinance 3930 do not affect Stage 2 and Stage 3 aircraft, which may otherwise require compliance with ANCA.

Further, ZAPS has not established with credible evidence that Stage 2 and Stage 3 aircraft performed and continue to perform the restricted touch (and stop) and go and other restricted activities at the Airport. The Declaration of ZAPS's member Mr. Arnold states he owns four airplanes with one being Stage 3, but he does not declare that his Stage 3 aircraft is based at the Airport or that he did or does use his Stage 3 airplane to perform restricted actions at the Airport. Mr. Arnold's other three airplanes are non-stage, restrictions on which do not require ANCA compliance.

(Herrera Dec. ¶¶ 23, 25.) Another member of Petitioner group, Mr. Gates, states he owns one airplane that he stores at the airport, but that airplane is a non-stage aircraft. (Herrera Dec. ¶¶ 23-24.)

### (3) An Injunction for Non-Compliance with ANCA Is Not Available to ZAPS.

ZAPS argues that it can obtain an injunction enjoining the City from implementing Ordinance 3930 because it subjects its members to enforcement provisions adopted in violation of ANCA, citing an out-of-circuit case, *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016), which held that the claim fell with "federal equity jurisdiction" where plaintiffs sought an injunction against local laws on the grounds the laws were preempted by ANCA. (OB at 17, 18-19). This argument lacks merit for several reasons.

### (a) ZAPS Has No Standing.

As a fundamental threshold issue, ZAPS provides no evidence to support its standing under ANCA or its entitlement to an injunction under this Court's "equity jurisdiction." As shown, there is no serious dispute that ANCA does not provide ZAPS with a private right of action (see above cases).

Additionally, pursuant to Article III of the Constitution, to have standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) *concrete and particularized* and (b) *actual or imminent*, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, *as opposed to merely speculative*, that their injury will be redressed by a favorable decision." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-181 (2000) (emphasis added); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  A case "becomes moot when the issues presented . . . lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation and internal quotation marks omitted).

As shown, the declarations in support of ZAPS's writ petition offer no evidence that any Stage 2 or 3 aircraft are based at, or regularly operate from, the Airport. (Herrera Dec. ¶¶ 23-25.) There is also no evidence: (a) that any ZAPS member ever sought to engage in any practice protocols regulated by Ordinance 3930, (b) that the City has any pending or *imminent* enforcement actions against its members, or (c) that the City has issued notices of violation against any ZAPS member. (*See* Arnold and Gates Declarations.) In short, there is no showing of a concrete or particularized injury, nor any pending or imminent injury due to enforcement actions — the case is speculative, conjectural, and hypothetical. *See Delux Public Charter, LLC v. County of Orange*, 2022 WL 3574442 (C.D. Cal. 2022) at *2, *6-8 (law and facts do not support plaintiff's standing under ANCA or the court's exercise of equity jurisdiction).

> **(b)** **ANCA Is Not Applicable, and *Friends of the East Hampton Airport* Is Distinguishable.**

Additionally, ANCA is not applicable to the Airport because as stated above, there are no Stage 2 or 3 aircraft based at or operating thereon (Herrerra Dec. ¶¶ 11), and the City does not take federal funds to operate the Airport or charge passenger facility fees.

ANCA, 49 U.S.C. § 47524, implemented through 14 C.F.R. Part 161, sets forth the FAA's airport noise and access restriction review program, including the need for FAA approval, before an airport operator implements an access or noise restriction on the operation of Stage 2 or Stage 3 aircraft. 49 U.S.C. § 47524. This FAA review program is consistent with ANCA's "national aviation noise policy . . . [that provides] for establishing by regulation a national program for reviewing airport noise and access restrictions on the operation of stage 2 or stage 3 aircraft." *Id*. § 47524(a). The airports that do not comply with ANCA procedures cannot receive federal funds or impose passenger facility charges. *Id*. §§ 47524(e), 47526.

Nothing in the text of ANCA suggests that Congress intended to federalize every airport in the nation, including small general aviation airports, like Torrance, with *no* staged aircraft based on, or regularly operating at, the Airport. (Herrera Dec. ¶ 11.)  There is also nothing in the text of ANCA preempting the traditional exercise of an airport proprietor's authority, particularly when the airport serves only small general aviation non-stage aircraft and is not receiving federal grant funds, nor charging any passenger facility fees.

More to the point, prior to ANCA, aviation case law expressly provided an exemption to preemption for a municipal airport owner exercising its proprietary authority. *E.g.*, *Gianturco*, 651 F.2d at 1316-1318; *Santa Monica*, 659 F.2d at 102-104; *Alaska Airlines*, 951 F.2d at 982. Historically, the responsibility for protecting residents from excessive aviation noise has been shouldered by the local, governmental airport proprietors due to the risk of *Griggs* liability. *See Di Perri v. Fed. Aviation Admin.*, 671 F.2d 54, 57-58 (1st Cir. 1982); *British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 82-84 (2d Cir. 1977); and *Nat'l Helicopter Corp. of Am. v. City of New York*, 952 F. Supp. 1011, 1022-1027 (S.D.N.Y. 1997), *aff'd in part*, *rev'd in part*, 137 F.3d 81 (2d Cir. 1998).

When Congress enacted aviation statutes empowering the FAA to address aviation noise, it preserved the authority established by caselaw of local airport proprietors to implement reasonable noise and safety restrictions at their facilities, particularly, public air carrier airports. *See, e.g.*, 49 U.S.C. § 41713(b)(3). There is nothing in ANCA about preemption and no suggestion of any congressional intent to have the FAA regulate non-federally funded airports; or airports with no Stage 2 or 3 aircraft based or operating thereon.

Thus, what Congress did when enacting ANCA was to provide an incremental addition of FAA oversight over airport noise and access restrictions on the operation of Stage 2 and Stage 3 aircraft at federally-funded airports, policed solely by the

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

FAA's exclusive monetary remedy — namely, the ineligibility of the airport to receive federal grant funds and the inability of the airport to impose passenger facility charges for noncompliance with ANCA conditions. *See* 49 U.S.C. §§ 47524(e), 47526.

Here, the record evidence is undisputed — the City has clear fee simple title to the Airport, free of the restrictions and conditions contained in a former, superseded 1948 deed from the United States. (*See* AR: 398; *see also* AR: 399-403, 407-410, 422-429, 438-439.) Also undisputed, the City has not received any federal funds for the Airport since 1986, and therefore, it is not bound by any grant agreements, deed covenants, or deed conditions with the FAA or subject to ANCA. (*See* AR: 404-405; and *see also* AR: 10059-10060 ["the City is not obligated under any FAA grant assurance, or deed covenant or condition, concerning its operation of the Torrance Airport;"] and AR: 10063 ["[t]he City is not in violation of any FAA sponsor assurance, grant obligation, or deed covenant."].)

ZAPS claims that *Friends of the East Hampton Airport*, 841 F.3d at 147-149 *requires compliance with* ANCA's procedural notice, comment, review, and FAA approval provisions for the restrictions in Ordinance 3930. However, *Friends of the East Hampton Airport* is easily distinguished.

In *Friend of the East Hampton Airport*, the Town, which owned and operated East Hampton Airport, obligated itself to comply with federal law based on its receipt of federal funding under the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 47101, *et seq.* 841 F.3d at 137-139. The Act establishes the Airport Improvement Program (AIP), which extends monetary grant funds to airports that, in return, provide statutorily mandated assurances (or grant assurances) to remain publicly accessible and abide by federal aviation law and policy. 49 U.S.C. §§ 47107(a)(1), 47108(a). The plaintiff in *Friends of the East Hampton Airport* asserted that ANCA's procedural requirements applied to all public airports regardless of

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

federal funding. 841 F.3d at 147. While the circuit court agreed, it made clear that the plain statutory text mandates ANCA's so-called "*procedural requirements for local noise and access restrictions on Stage 2 and 3 aircraft at any public airport.*" *Id*. at 148 (original emphasis and emphasis added).

In short, the FAA's statutory authority to enforce ANCA, 49 U.S.C. § 47524(b) and (c), applies to airport noise and access restrictions "on the operation of" Stage 2 aircraft (*id*. § 47524(b)), and "on the operation of" Stage 3 aircraft (*id*. § 47524(c)). There are no Stage 2 or 3 aircraft based at, or regularly operating from, Torrance Municipal Airport (*see* Herrerra Dec. ¶ 11), and therefore, Ordinance 3930 is not restrained by ANCA because it is inapplicable.

**(c)    Injunctive Relief Is Not Available to ZAPS Under ANCA.**

ANCA states expressly that injunctive relief applies only to other substantive provisions of ANCA not at issue in this case. Specifically, 49 U.S.C. § 47533 states:

"*Except as provided by section 47524 of this title*, this subchapter does not affect . . .

(3) the authority of the Secretary of Transportation to seek and obtain legal remedies the Secretary considers appropriate, including injunctive relief." (emphasis added).

Congress would not have "excepted" section 47524 from section 47533 if it intended the injunctive relief remedy permitted by section 47533 to be created as an equitable remedy to be used by the courts to enforce section 47524. In fact, the Supreme Court has held that this kind of deliberate exception suffices to show congressional intent to halt an additional, judicially created remedy. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). Further, because Congress did not intend the injunctive relief remedy for non-compliance with ANCA's section 47524 to be available to the FAA, it plainly did not intend that a private organizational plaintiff could have this remedy available. At bottom, section 47524 provides the procedures for Stage 2 and Stage 3 restrictions, and then it states (along with Section 47526) that

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

withholding funds and charges are the remedies (not broad-based private party unsupported requests for injunctive relief).

**(d)    In Any Case, ZAPS Has Failed to Make an Evidentiary Showing to Support Issuance of a Permanent Injunction.**

And in any case, an organizational plaintiff seeking an injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), and cases there cited. "A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Id.* at 24, citation and internal quotation marks omitted. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*, citation omitted. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Here, ZAPS has made no evidentiary showing that it is likely to succeed on the merits; has offered no proof of any irreparable harm; and has not sought to balance the competing injury claims or the public interest harm to the local neighboring community should the restrictions in Ordinance 3930 be enjoined. In short, ZAPS has failed to meet its burden of proving entitlement to an injunction. This, alone, is sufficient grounds to dismiss this case.

**C.    Ordinance 3930 Was Adopted for Legitimate Purposes.**

As discussed above, the record is clear that Ordinance 3930's purpose is to reduce noise and promote safety issues for the City's residents, which is a local concern that the City can address under its airport proprietor authority. That a reduction in hours for certain operations under Ordinance 3930 may have the effect of limiting the number of training landings and takeoffs does not make the purpose of Ordinance No. 3930 "improper."

28

1

2

3

### D. There Is No Obligation for the City Not to Limit the Usefulness of the Airport; and in Any Event, Ordinance 3930 Does Not Limit It.

4

5

6

7

8

9

10

11

12

ZAPS' argument that Ordinance 3930 violates the restriction in the 1956 deed by improperly limiting the "usefulness" of the airport is misleading. The FAA confirmed in its 2004 analysis (AR: 10057)[5] that the only restriction imposed by the 1956 deed is for the City to maintain the property as the airport. The City disagrees with the FAA's 2004 analysis and concurs with the FAA's 1988 letter to the City that no restrictions bind the City's operations of the airport (except for a license to explore and excavate fissionable materials). (*See* AR: 398-440.) Regardless, however, the City continues to use the site as a public general aviation airport, and the City has not adopted any restrictions limiting the "usefulness of the airport."

13

14

15

16

And on its face, Ordinance 3930 does not limit the usefulness of the airport as it allows (a) takeoffs and landings to a full stop, and (b) full stop-taxi back and low approach protocols between 10:00 a.m. and 6:00 p.m., Monday through Friday. (*See* AR: 9213-9215, 9271-9272.)

17

### E. Ordinance 3930's Saving Clause.

18

19

20

21

22

23

As stated above, Ordinance 3930, Section 3, contains its own savings clause, which states in part that "[i]f any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason deemed or held to be invalid or unconstitutional by the decision of any court . . . , such decision will not affect the validity of the remaining portions of this ordinance." (AR: 9214.)  Though there is no reason to do so, should this Court find any part of Ordinance 3930 unconstitutional, it

24

25

26

27

28

---

[5] The FAA's 2004 analysis (AR: 10057) contradicts the FAA's 1988 letter to the City (AR: 439), in which the FAA confirmed that the City "holds fee title to the land … subject to the Federal government's license to explore and excavate fissionable materials."

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*

should invalidate only that part, leaving the remaining ordinance in full force and effect.

**V.    CONCLUSION**

The City respectfully requests that the Court *deny* ZAPS's motion for writ of mandate to invalidate Ordinance 3930.  Ordinance 3930 is a noise control ordinance rationally related to the legitimate interest of minimizing noise in the neighboring communities surrounding much of the Airport.  As shown above, Ordinance 3930 is the legitimate exercise of the City's airport proprietor exception to field preemption, and the ordinance is not unreasonable, arbitrary, or unjustly discriminatory. ZAPS's ANCA claim fails because ANCA has no private right of action available to ZAPS or other third parties, and ANCA is not applicable to airports with no Stage 2 or Stage 3 aircraft, such as Torrance Airport. ZAPS also has no standing under ANCA and failed to satisfy the evidentiary standards required for the issuance of an injunction.

August 13, 2025                          OFFICE OF CITY ATTORNEY

                                         By:   /s/ Patrick Q. Sullivan
                                              Patrick Q. Sullivan
                                            Attorney for City of Torrance


August 13, 2025                          GATZKE DILLON & BALLANCE LLP

                                         By:   /s/ Mark J. Dillon
                                              Mark J. Dillon
                                              Lori D. Balance
                                              Yana L. Ridge
                                         Attorneys for City of Torrance

## PROOF OF SERVICE

I declare that I am employed with the law firm of Gatzke Dillon &Ballance LLP, whose address is 2762 Gateway Road, Carlsbad, California 92009. I am not a party to the within cause, and I am over the age of eighteen.

I hereby certify that on August 13, 2025, I served by mail the foregoing:

**Respondent City of Torrance's Brief in Opposition to Petitioner's Motion for Writ of Mandate**

**Request for Judicial Notice in Support of Respondent City of Torrance's Opposition to Petitioner's Motion for Writ of Mandate**

**Declaration of Rafael Herrera in Support of Respondent City of Torrance's Opposition to Petitioner's Motion for Writ of Mandate**

on the following persons at the following addresses in accordance with L.R. 5-3-.2 and F.R.Civ.P. 5.

Stan M. Barankiewicz II, Esq.
Christopher M. Wolcott
Orbach Huff & Henderson LLP
1901 Avenue of the Stars, Suite 575
Los Angeles, CA 90067
sbarankiewicz@ohhlegal.com
cwolcott@ohhlegal.com

*Attorneys for Petitioner, Zamperini Airfield Preservation Society*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Carlsbad, California on August 13, 2025.

Sue Toms

_____
Sue Toms

*RESPONDENT CITY OF TORRANCE'S BRIEF IN OPPOSITION TO MOTION FOR WRIT OF MANDATE*